**Bonard G. STICE and Gladys Stice, Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 75–1418.**

United States Court of Appeals
Fifth Circuit.

Oct. 14, 1976.

Frank D. McCown, U. S. Atty., William L. Johnson, Jr., Asst. U. S. Atty., Fort

---

Worth, Tex., Lawrence R. Jones, Jr., William W. Guild, Tax Div., Dept. of Justice, Dallas, Tex., Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Acting Chief, App. Sec., John G. Manning, Michael L. Paup, Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellant.

O. Jan Tyler, Robert K. Sands, Dallas, Tex., for plaintiffs-appellees.

Before GEWIN, GODBOLD and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge: ·

Appellee-taxpayer Bonard G. Stice[1] (hereinafter taxpayer) is a farmer who, during the periods involved in this appeal, raised cotton, wheat, and milo (a feed grain) on approximately 3000 acres of land in Terry County, Texas. Prior to 1968, taxpayer bought most of the fertilizer for his farm from two suppliers, Goodpasture Grain & Milling Company, Inc. (hereinafter Goodpasture), and Pat-Sol Company, and paid for the fertilizer as it was received.

In November of 1968, taxpayer's wholly owned corporation, Johnson Gin, Inc.,[2] became a dealer for the sale of Goodpasture's agricultural fertilizer and chemicals.[3]

In December of 1969,[4] taxpayer wrote three checks to Johnson Gin in the amounts of $52,596, $8,400, and $8,625, for a total of $69,621. The check written for $52,596 bore a notation that $27,638 of that amount was for 300 tons of 11–37–0 fertilizer, and the remaining $24,960 was for 400 tons of 16–20–2 fertilizer. The $8,400 check was for 70 five-gallon cans of Treflan, and the $8,625 check was for 25 thirty-gallon drums of Fumazone. From all these orders, the only fertilizer actually delivered in 1969 was roughly 91 tons of 16–20–2 fertilizer at approximately $73 per ton, for a total of $6,661.62.

Johnson Gin's dealership agreement with Goodpasture did not require prepayments by Johnson Gin for any materials ordered from Goodpasture. Nor did Johnson Gin require any of its customers to prepay for materials ordered from it. Taxpayer testified that one customer may have possibly paid Johnson Gin in April 1970, for fertilizer delivered in May 1970.

In each of the years that taxpayer made prepayments for fertilizer and other chemicals to be delivered the following year, he deducted the prepayments on his income

1. Gladys Stice, the wife of Bonard Stice, was a party to the proceeding before the district court only because she filed a joint income tax return with her husband for the taxable year 1969. Accordingly, taxpayer as used in this opinion refers to Bonard Stice individually.

2. Johnson Gin, Inc., was a Texas corporation which, prior to the dealership agreement entered into with Goodpasture, was engaged in ginning cotton and selling seed, hardware, and gasoline. Taxpayer acquired one-half of Johnson Gin's stock in 1964 and the·remaining half in 1966.

3. Under the terms of the dealership arrangement, Johnson Gin was to receive a 7% commission on all sales of fertilizer and chemicals billed by Goodpasture to Johnson Gin, a 10% discount on all sales to Johnson Gin if payment was made within twelve months, and a discount of $1.50 per ton on all fertilizers and chemicals which Johnson Gin hauled from Goodpasture's plant in Brownfield, Texas. In addition, Goodpasture agreed to furnish John-

son Gin with two tanks having a combined capacity of 120,000 gallons for the storage of liquid fertilizer, and four machines, known as applicators, used for spreading fertilizer on the land.

4. In December of 1968, one month after Johnson Gin became a dealer for Goodpasture, taxpayer deviated from his prior practice of paying for fertilizer when delivered and, instead, wrote a check to Johnson Gin in the amount of $22,875, purportedly for 375 tons of fertilizer. The record shows that none of this fertilizer was delivered in 1968, and what was delivered in 1969 differed not only in terms of the types and amounts of fertilizer ordered, but also as to types of merchandise. Some of the amount paid in 1968 was applied toward the purchase of seed, chemicals (Fumazone), and the rental of some large applicators for spreading fertilizer. However, none of the deductions for the taxable year 1968 is in question in the present litigation.

tax return.[5] After auditing taxpayer's 1969 income tax return, the Commissioner of Internal Revenue disallowed the deduction taxpayer claimed for that portion of taxpayer's December 1969 prepayments which remained as an outstanding credit at the end of the year. Taxpayer paid the resulting deficiency in income taxes plus interest and late payment penalty, and filed a claim for a refund of the amounts paid. After disallowance of the claim, the taxpayer brought suit in the district court for a refund. After all the evidence was in, the court submitted the case on three special interrogatories requesting the jury to determine: (1) whether the $63,000 (approximately) paid by taxpayer and disallowed as a deduction by the commissioner constituted a deposit; (2) whether taxpayer's income tax return on which the $63,000 was claimed as a deduction clearly reflected his income for that year; and (3) whether taxpayer had a valid business purpose in paying the $63,000 in December 1969. The jury returned special verdicts in favor of taxpayer in all three instances. The district court entered judgment for taxpayer after denying the government's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. From this judgment the government appeals. We reverse.

The single issue on appeal is whether the substantial prepayments made by taxpayer in 1969 constituted nondeductible deposits, rather than ordinary and necessary business expenses deductible in the taxable year pursuant to Title 26, U.S.C., Section 162(a),[6]

and Treasury Regulation, 26 C.F.R., Section 1.162–12(a).[7]

Both parties to this litigation rely on cases and rulings dealing specifically with the purchase of feed for livestock. See, e. g., *Owens v. C. I. R.*, 64 T.C. 1 (1975); *Mann v. C. I. R.*, 8 Cir. 1973, 483 F.2d 673; *Lillie v. C. I. R.*, 45 T.C. 54 (1965), aff'd per curiam, 9 Cir. 1966, 370 F.2d 562. See Rev. Rul., 75–152.[8] We seriously question the allowability of deductions for prepayments in any situation but the very narrow one where the prepayment is for feed, and we find no support for the allowance of deductions in any other type of prepayment situation. However, we deal with the present case as if it were directly analogous to the feed prepayment situation because we are convinced that this case, even when viewed from such a preferred position, still does not qualify for an allowance for a deduction in the taxable year involved.

As noted, the taxpayer in December of 1969 made a prepayment to his wholly owned supplier in the amount of $69,621. Below is a table showing alleged purchases made in 1969 constituting this credit:

Materials "purchased" in 1969

| Item | Unit price | Total price |
|---|---|---|
| 400 tons of: 16–20–2 fertilizer | $62.40/ton | $24,960 |
| 300 tons of: 11–37–0 fertilizer | $92.12/ton | $27,636 |
| 350 gallons of: Treflan | $24/gallon | $ 8,400 |
| 25 thirty-gallon drums of: Fumazone | $345/drum | $ 8,625 |
| Total "purchases" in 1969 | | $69,621 |

**5.** Taxpayer filed his income tax returns, and maintained his records, on a cash receipts and disbursements basis.

**6.** Section 162(a), Internal Revenue Code of 1954, § 162(a) of Title 26, U.S.C., reads in relevant part as follows:
"There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . "

**7.** 26 C.F.R., § 1.162–12(a) reads in relevant part, as follows:
"A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expend-

ed in the carrying on of the business of farming."

**8.** The commissioner, 1975–1 C.B. 144, makes the following provision:
"A cash-method farmer may deduct in the year of payment *the amounts paid for feed* to be consumed by his own livestock in a following taxable year provided (1) the expenditure is for the purchase of feed rather than a deposit, (2) the prepayment is made for a business purpose and not for tax avoidance, and (3) the deduction will not result in a material distortion of income." (Emphasis added).

Of all the goods claimed as purchased in 1969, only about 91 tons of 16–20–2 fertilizer, at a cost of approximately $73 per ton, or $6,662, were actually delivered in that year. In 1970, 111 gallons of Treflan, at $22.40 per gallon, and 9 thirty-gallon drums of Fumazone, at $345 per drum, were actually received, for a total of $5,591. The other purchases that were charged against the $69,621 credit to taxpayer's account in 1970 were as follows: chemicals other than Treflan and Fumazone, $6,975; gasoline and cotton burs, $2,756; cotton seeds and unidentified supplies, $31,313; rental for fertilizer applicator, $190; 114 tons of fertilizer other than 16–20–2 and 11–37–0, $7,437. Taxpayer does not in any way refute these figures, but argues that his receipt of such goods as seed, chemicals, and gasoline, all of which were used in the farming operation and the cost of which was credited against the 1969 prepayment was sufficient to allow a deduction for the year in question. The argument seems based principally on the fact that no refund of any prepayment was ever made. We do not find this persuasive.

In a recently published revenue ruling, Rev.Rul. 75–152, Int.Rev.Bul. No. 1975–17, the Commissioner stated:

> "Whether a particular expenditure is a deposit or a payment depends on the facts and circumstances of each case. Where it can be shown that the expenditure is made pursuant to a binding commitment to accept delivery of a specific quantity of feed at a fixed price, and the buyer is not entitled, under contract provision or business custom, to a refund or repurchase, the expenditure will not be considered a deposit. The following factors, although not all inclusive, are indicative of a deposit, rather than a payment: the absence of specific quantity terms; the right to refund of any unapplied credit at the termination of the contract . . .; the treatment of the expenditure as a deposit by the seller; and the right to substitute other goods or products for the feed ingredients specified in the contract."

This ruling indicates clearly that taxpayer's prepayment was a deposit. While there were specific quantities stated at the time the payment was made, those quantities, as noted, bore little relationship to the items actually charged against taxpayer's credit. The issue of specificity in determining the nature of a payment is supported by *Estate of Cohen v. C. I. R.*, ¶ 70,272 P–H Memo T.C., p. 1331 (1970). In *Cohen* the court held that a provision in one of the contracts which called for "the payment of '22½¢ per pound weight gain during feeding' with $54 per head payable in advance (a total advance payment of $16,686) does not set forth with sufficient specificity that this is an actual purchase of feed . . . . [Taxpayer] did not purchase merchandise with the remittance of $16,686 but instead merely created a debit balance in an account that was to be credited as his cattle were fed and gained weight. For this reason we conclude that this was a deposit and was not properly deductible in . . . the . . . taxable year before us." *Id.* at 1340.

Also, while there was no evidence of refunds actually being made to taxpayer, it is apparent that taxpayer, as the sole owner of Johnson Gin, could have refunded to himself such prepayments as he chose. In allowing deductions of substantial end-of-year payments in *Ernst v. C. I. R.*, 32 T.C. 181 (1959), the tax court stated that such payments were clearly not deposits because they "were absolute and petitioner, who reported his income on a cash receipts and disbursement basis, was irretrievably out of pocket the amounts paid, which amounts were obviously expenses incident 'to carrying on a trade or business.' In return for these payments, the grain dealer was unconditionally obligated to deliver the quantity of feed which the amounts received would pay for at the prices in effect on the dates of delivery. There was no condition as to the obligation itself; the only condition was as to the *quantum* of the obligation." *Id.* at 185–186. The relationship that taxpayer had with Johnson Gin was much less restrictive. Any "obligations"

that taxpayer may have had to Johnson Gin were flexibly interpreted by both parties, and were not of the binding nature of those in *Ernst.* More applicable to the facts in this case are *Shippy v. United States,* 8 Cir. 1962, 308 F.2d 743, where the court found that a substantial prepayment was merely an advance deposit because it would have been refunded upon request, and *Lillie v. C. I. R.,* 45 T.C. 54 (1965), aff'd per curiam, 9 Cir. 1966, 370 F.2d 562, where the court found too little correlation between what was paid for and what was delivered to allow the deduction.

Assuming *arguendo* that taxpayer could not have demanded a refund, he was still not without recourse as in fact he applied the credit to a variety of goods other than those claimed to have been purchased with the prepayment. Additionally it appears that he sold some of the supplies purchased from Johnson Gin to his son and to neighbors. Appellant's Appendix, pp. 97–98, 100, 235. The record is clear that taxpayer not only had the right to substitute goods for the goods specified, but did in fact so substitute. All of these factors, in light of Rev.Rul. 75–152, supra, persuade us that the 1969 "purchase" must be treated as a deposit.

Of course the taxpayer was entitled to deduct the ordinary and necessary business expenses of his farming operations pursuant to Title 26, U.S.C., Section 162(a), and Treasury Regulation, 26 C.F.R., Section 1.162–12(a). But those provisions provide no support for deductions of end-of-year payments where, as here, the prepayment bore only slight relationship to the goods actually received.

Again quoting from Rev.Rul. 75–152:

"The second test [for deductibility] is that the prepayment must be made for a valid business purpose and not merely for tax avoidance. Generally, the factor that distinguishes the court decisions allowing a deduction for prepaid feed costs from those disallowing the deduction is the acquisition of, or the reasonable expectation by the taxpayer of receiving, some business benefit as a result of the prepayment. See *John Ernst,* 32 T.C. 181 (1959), acq., 1959–2 C.B. 4; *Cravens v. Commissioner,* 272 F.2d 895 (10th Cir. 1959); *Shippy v. United States,* 308 F.2d 743 (8th Cir. 1962), aff'g 199 F.Supp. 842 (W.D.S. Dak.1961); and *Tim W. Lillie,* 45 T.C. 54 (1965), aff'd per curiam, 370 F.2d 562 (9th Cir. 1966). Examples of business benefit include, but are not limited to: fixing maximum prices and securing an assured feed supply or securing preferential treatment in anticipation of a feed shortage. Whether the prepayment was a condition imposed by the seller and whether such condition was meaningful should also be taken into consideration in determining whether there was a business purpose for the prepayment."

1975–1, C.B., p. 144, Rev.Rul. 75–152.

See also in this connection, *Mann v. C. I. R.,* 8 Cir. 1973, 483 F.2d 673, where the court allowed the deduction because it found, *inter alia,* that the maximum price guarantee was a benefit to taxpayer because it protected him against a rising market price; *Gaddis v. United States,* 330 F.Supp. 741 (S.D.Miss.1971), where the district court entered judgment for taxpayer because the prepayment was made primarily in the light of forecasts of an increase in the price of feed and as a protection for future increase.

This record contains no evidence that the taxpayer sought or secured the type of advantage under discussion. There was no indication of any shortage of the goods ordered, or that taxpayer would receive any business advantage not available without any prepayment. Taxpayer received no cost advantage as he paid more for the fertilizer received than the December 1969 agreement provided for. Lastly, such prepayment was not a condition imposed by the seller. Taxpayer was the only Johnson Gin's customer ever making a substantial prepayment.

For the enumerated reasons, the jury verdict for the taxpayer is not supported by the evidence. The only logical conclusion to

be drawn from the record is that the dominant, if, indeed not the only purpose for taxpayer's substantial end-of-year prepayments was an attempt to provide a basis for a significant tax deduction for the taxable year 1969. The Commissioner's disallowance of such deduction was justified as a matter of law, and accordingly it was error for the district court to deny the government's motion for judgment n. o. v.

The judgment appealed from is reversed, with directions to enter judgment for the United States.

REVERSED.