LaVERNE SCHENK and MARGARET SCHENK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schenk v. Commissioner
Docket No. 5543-79.
United States Tax Court
T.C. Memo 1980-531; 1980 Tax Ct. Memo LEXIS 55; 41 T.C.M. (CCH) 455; T.C.M. (RIA) 80531; December 1, 1980
Donald R. Ham and Ronald D. Nickum, for the petitioners. Norman A. Lofgren, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency of $14,558 in petitioners' Federal income taxes for 1975. Due to concessions, the only issues for decision are whether a structure built on petitioners' farm in 1975 is property which qualifies *56 for the investment credit and whether petitioners' payment of $24,782 to a farm cooperative on December 30, 1975, constitutes a deductible prepaid expense. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners, LaVerne and Margaret Schenk, were residents of Texas when they filed their petition herein. LaVerne Schenk (hereinafter petitioner) is a farmer who raises mostly wheat and milo and also runs a few cattle. In 1975, he built a 50 feet by 100 feet steel structure on his farm for the avowed purpose of storing grain. Having space to store grain is a necessary part of petitioner's business, and maintaining one's own storage area is beneficial because outside space is not always available. The structure, which cost $26,162 to build, has insulated metal walls, an undivided interior space, concrete flooring, and doors large enough to admit large pieces of machinery or farming equipment. One portion of the roof consists of skylights, but no aeration or drying facilities are installed. Thus, only dry grain can be stored in the structure, any wet grain harvested must be taken to a grain elevator. While most grain storage structures have *57 reinforced walls, this one does not. Petitioner stored no grain in the structure during 1975 but has done so since then. When grain is stored, it is brought in by dump truck and then arranged in slanting piles by a grain loader. Petitioner has a combine; several tractors, trucks, and motorcycles; and 15 to 20 irrigation motors which he uses in his business. He owns no structure, other than the one built in 1975, in which this machinery and equipment could be stored. Except for trucks loaded with feed or grain, petitioner's equipment is usually left outside. When the structure was visited by respondent's agent in early 1980, it housed two loaded trucks and three motorcycles. Two years after construction, petitioner installed a work bench under the skylights in the structure because he felt it would be a good place to repair machinery and equipment. Petitioner does most of his own repairs but does not recall if any repairs were performed in the structure during 1975, although maintenance work was performed there from "time to time." For several years, petitioner has been a member of the Dawn Cooperative (hereinafter Cooperative) which sells him and its approximately 250 *58 other members various supplies such as fertilizer, seed, feed, parts, oil, and gas. On December 30, 1975, petitioner delivered his check for $25,000 to the Cooperative. The check bore a notation that it was for fertilizer and supplies. According to his instruction, $20,000 was credited to his Cooperative fertilizer account and $5,000 was credited to his Cooperative general supply account. Upon receipt of the payment, the Cooperative issued an invoice denoting $20,000 as being a prepayment for approximately 100 tons of fertilizer and $5,000 as being a prepayment for supplies. Petitioner made large end-of-year payments to the Cooperative for the 5 or 6 years preceding 1975, and other Cooperative members made similar payments. Petitioner is a cash basis taxpayer, and he deducted the $25,000 payment on his Federal income tax return for 1975, as he had deducted previous end-of-year payments on past returns. Although the Cooperative had no written or oral policies concerning refunds, prepaid amounts were not refundable. No refunds were ever made--if a positive balance remained in an account at the end of a year, it was carried forward to the next year. Petitioner never expected *59 a refund and did not believe he had a right to one if he did not accept delivery of sufficient quantities of fertilizer to exhaust his account balance. In December 1973, petitioner paid $23,000 to the Cooperative which was credited to his fertilizer account. During 1974 sums of $1,928.22 and $1,473.46 were transferred from his fertilizer account to his general supply account. In December 1974, petitioner paid $20,000 to the Cooperative which was credited to his fertilizer account. During 1975, $10,243.74 was transferred from his fertilizer account to his general supply account. No transfers between accounts were made during 1976. The transfers were made by bookkeepers, and neither the Cooperative's manager, its Board of Directors, nor petitioner specifically authorized them. Although petitioner sat on the Cooperative's Board of Directors and served as its president for a time, he had nothing to do with the Cooperative's preparation or keeping of account books or records. Petitioner noted from his account statements that amounts had been transferred during 1974 and 1975 from his fertilizer account to his general supply account, but he thought the transfers were made to cover *60 fertilizer charged to his general supply account. In addition to significant amounts of fertilizer, petitioner purchased various items used in his farm business through his general supply account such as salt, oil, gas, seed, gloves, filters, and plugs. However, he also charged ham, bacon, soft drinks, and dog food to that account. When he made the 1975 payment at issue herein, petitioner believed that he was insuring himself a supply of fertilizer during the remainder of 1975 and during 1976. Fertilizer supplies were unstable at that time, and many felt a severe shortage was forthcoming. While his payment in no way fixed the price to be charged for fertilizer delivered to him in the future, petitioner believed that he had an enforceable right against the Cooperative to receive $20,000 worth of fertilizer. During 1976, petitioner actually took delivery of more than $20,000 worth of fertilizer which was charged to his fertilizer account. According to the Cooperative's fertilizer allocation system, petitioner's payment did not guarantee him $20,000 worth of fertilizer to be delivered in the future. The Cooperative bought most of its fertilizer from Farmland Industries, a large *61 supplier. Due to shortages, the Cooperative and Farmland's other buyers received allocations based on prior years' purchases to determine the amounts they could buy in years 1974 and after. In turn, the Cooperative set allocations based on its members prior years' purchases to determine the amounts those members could buy from the Cooperative. The allocation of fertilizer supplies to members in no way depended on whether any member prepaid nor was any preference given in time of delivery to those who prepaid. It was strictly first come, first serve--the only limit being a member's allocation. In his statutory notice of deficiency, respondent disallowed the $2,616 investment credit claimed by petitioner on the structure built in 1975 and disallowed $24,782 of petitioner's claimed deduction of $37,416 for fertilizer in 1975. OPINION Investment Credit
In 1975, petitioner built a metal structure on his farm for the avowed purpose of storing grain. Respondent contends the structure is a "building" disqualified for the investment credit under section 48(a)(1)(B). [1] Petitioner contends *62 the structure is excepted from classification as a building by section 1.48-1(e)(1), Income Tax Regs. We agree with respondent. Section 38 allows a credit for investment in certain depreciable property. In order to qualify for the credit, property must be "section 38 property", as defined in section 48 which provides in part: SEC. 48. DEFINITIONS; SPECIAL RULES. (a) Section 38 Property.-- (1) In general.--Except as provided in this subsection, the term "section 38 property" means-- (A) tangible personal property, or (B) other tangible property (not including a building and its structural components) but only if such property-- (i) is used as an integral part of manufacturing, production, or extraction * * *, or (ii) constitutes a research facility used in connection with any of the activities referred to in clause (i), * * * Accordingly, a "building and its structural components" do not qualify *63 for the investment credit. Section 1.48-1(e)(1), Income Tax Regs., defines "building" as follows: (e) Definition of building and structural components. (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. * * * Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. *64 Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples. In short, "building" is given its normal meaning, but excepted from its definition are structures with a certain close relation to the property they house. See generally Satrum v. Commissioner, 62 T.C. 413 (1974). It is within this exception that petitioner maintains his structure, as a grain storage facility, falls. We cannot agree. A grain storage bin, silo, or coal tipple falls within the exception, while a barn, garage, or warehouse does not. The distinguishing factor is the close relation that the structures in the first group bear to the property they house. The regulation provides two factors which will indicate the requisite close relation: *65 special design and unsuitability for other use. Petitioner's structure possesses neither. The only special design feature petitioner noted at trial or on brief was the cement floor upon which grain could be piled. He discounted the absence of reinforced walls and interior divisions a minor variations from the normal grain storage facility. However, we cannot stretch our imagination to the point where a concrete floor alone is indicative of special design. The suitability of petitioner's structure for purposes other than grain storage cannot seriously be questioned. A 50 feet by 100 feet metal structure with an undivided interior, equipment entry sized doors, insulated walls, roof lighting, and cement flooring is certainly suitable for equipment and machinery storage, rapair and maintenance work, and even a harvest celebration on a rainy day. In fact, petitioner does maintenance and repair work in the structure and uses it to house machinery as in evidenced by the presence of three motorcycles when respondent's agent visited the structure. For the above reasons, we conclude that petitioner's structure is a building and is not property which qualifies for the investment *66 credit. Fertilizer Prepayment
On December 30, 1975, petitioner delivered his check for $25,000 to the Dawn Cooperative for fartilizer and supplies to be delivered principally during 1976. Petitioner contends the payment represents a prepaid business expense deductible in 1975. Respondent contends $24,782 of the payment is not deductible in 1975 because it is a deposit rather than an actual prepayment for specified goods; there was no business purpose for prepayment; and allowing the deduction would materially distort petitioner's 1975 taxable income. [2] For the reasons below, we agree with respondent. Respondent's argument parallels his position in Revenue Ruling 75-152, 1975-1 C.B. 144, concerning cash basis farmers' deduction of prepaid feed expenses.Revenue rulings only represent the position of one of the parties. They are not law and do not constitute authority for deciding a case in this Court. Estate of Lang v. Commissioner, 64 T.C. 404 (1975), *67 affd. in part and revd. in part 613 F.2d 770 (9th Cir. 1980); Stubbs, Overbeck & Associates v. United States, 445 F.2d 1142 (5th Cir. 1971). However, that does not mean their reasoning cannot be correct. See Neuhoff v. Commissioner, 75 T.C.     (Oct. 7, 1980). In Stice v. United States, 540 F.2d 1077 (5th Cir. 1976), the United States Court of Appeals for the Fifth Circuit approved Revenue Ruling 75-152 's requirements of actual prepayment for specific goods and business purpose for the deduction of prepayments. Since appeal of this case would lie to that court, we will analyze the case before us with due regard to the guidelines pronounced in Stice. We must first decide whether petitioner's payment was an actual prepayment for fertilizer or only a deposit. Only if we find an actual payment, do we need to address respondent's contentions that petitioner had no business purpose for prepayment and that allowing the deduction would materially distort petitioner's 1975 taxable income. [3]
*68 Stice involved a farmer who paid his wholly owned corporation substantial amounts in December 1969 purportedly for specific amounts of specific types of fertilizer to be delivered in 1970. In fact, substantial amounts of other goods were delivered in 1970 and charged against the prepayment credit. The Court of Appeals held a nondeductible deposit rather than an actual prepayment had been made, and no business purpose was served by the prepayment. The court said: We seriously question the allowability of deductions for prepayments in any situation but the very narrow one where the prepayment is for feed, and we find no support for the allowance of deductions in any other type of prepayment situation. * * * [540 F.2d at 1079.] However, as did the Court in Stice, we will evaluate all the facts and circumstances surrounding petitioner's payment to determine if he is entitled to a deduction in 1975.
Our first inquiry is whether petitioner made an actual prepayment for fertilizer or only a deposit when he delivered his check for $25,000 to the Cooperative. In analyzing *69 this issue in Stice, the Fifth Circuit Court of Appeals relied on three factors to find a deposit--the refundability of the payment, the absence of specific quantity terms, and the taxpayer's right to substitute other goods for the goods purportedly covered by the prepayment. In this case, petitioner's payment was not refundable. While the Cooperative had no written or oral policies concerning refunds, no refunds were ever made, the petitioner never expected to receive one if he had not taken delivery of enough fertilizer to erase his payments. Nonrefundability by the terms of a contract is not required even under the respondent's position in Revenue Ruling 75-152, supra, which speaks of nonrefundability "under contract provision or business custom." Thus, we conclude that petitioner was "irretrievably out of pocket the amounts paid." Ernst v. Commissioner, 32 T.C. 181, 185-186 (1959). In Stice, the taxpayer-farmer's supplier was his wholly owned corporation, and the Circuit Court found he could have refunded payments to himself as he chose. Such *70 is not our case. While petitioner sat on the Cooperative's Board of Directors and served as its president for some time, he did not control the Cooperative's actions in this respect. The factors relating to specificity of quantity terms and substitution of goods are not so easily resolved. In Stice, specific quantities of specific types of fertilizer were stated at the time the payment in that case was made, but those quantities and types bore little relationship to the items actually charged against the taxpayer's credit during the following year. For that reason, the appellate court, relying on Cohen v. Commissioner, T.C. Memo. 1970-1972, held the payment was not made with specific quantity terms. The court relied on the same facts to determine the taxpayer could substitute goods for the goods purportedly covered by the payment. Given the Stice analysis, we see no way logically to separate the specific quantity factor from the presence of a right to substitute goods. While $5,000 of petitioner's payment is clearly a deposit for unspecified goods, the remaining $20,000 is more difficult to categorize. If the specific quantity term could be viewed *71 in isolation, we might conclude petitioner had met it as to the $20,000. Petitioner's check for $25,000 bore a notation that it was for fertilizer and supplies, and the Cooperative's corresponding invoice denoted $20,000 as being for approximately 100 tons of fertilizer. Petitioner's payment could not have been for a more specific amount of fertilizer than that expressed in the Cooperative's invoice absent a fixed price. The lack of a fixed price does not alone render a payment a deposit, Ernst v. Commissioner, supra, and we are not inclined to require one indirectly by requiring a more specific quantity term. Nevertheless, a specific quantity term is meaningless if the parties do not respect it. In Stice, the taxpayer-farmer's checks bore notations that the payments were for specific amounts of specific types of fertilizer. In fact, the payments established a general credit against which the taxpayer charged not only fertilizer but significant amounts of other chemicals, gasoline, cotton seeds, and unidentified supplies. The Fifth Circuit Court of Appeals found *72 that fact to be fatal: [Section 162(a) and section 1.162-12(a), Income Tax Regs.] provide no support for deductions of end-of-year payments where, as here, the prepayment bore only slight relationship to the goods actually received. [540 F.2d 1077 at 1081.] In this case, $20,000 of petitioner's $25,000 payment was credited to his fertilizer account against which only fertilizer could be charged. Furthermore, more than $20,000 worth of fertilizer was actually charged to that account during 1976--the year immediately following the prepayment. However, unless the $20,000 was irretrievably placed in the fertilizer account, it cannot be considered as a prepayment for fertilizer. During 1974, sums of $1,928.22 and $1,473.46 were transferred from petitioner's fertilizer account to his general supply account. During 1975, a transfer of $10,243.74 was made. Petitioner knew from his account statements that these amounts had been transferred during 1974 and 1975. Thus, payments allocated to petitioner's fertilizer account could be transferred to his general supply account thereby losing their identity as payments for fertilizer. Although *73 no transfers between accounts were made in 1976, petitioner has not shown that transfers could not have been made. He bears the burden of proof. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Accordingly, we conclude the $20,000 was not irretrievably placed in the fertilizer account and cannot be characterized as an actual prepayment for fertilizer. Nevertheless, petitioner contends that the 1974 and 1975 transfers were made by Cooperative bookkeepers to cover fertilizer charged to his general supply account in those years, and, therefore, any transferred payments retained their identity as payments for fertilizer. We cannot agree. Although some fertilizer was charged to petitioner's general supply account in 1974 and 1975, petitioner has not shown a direct relation between the transfers and those charges. It is not enough that the transferred amounts could have been or even probably were made because of fertilizer charges. They were not shown to have actually been in payment for fertilizer. Credits to petitioner's supply account could cover a myriad of goods including gas, oil, seed, dog food, and soft drinks. *74 Thus, we find the transferred amounts were not necessarily used as payments for fertilizer. For all of these reasons, we conclude that petitioner's payment was not an actual payment for fertilizer but was only a nondeductible deposit potentially applicable to a wide variety of goods. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise provided.↩
2. The $24,782 disallowed represents petitioner's $25,000 prepayment less $218 attributable to fertilizer delivered during 1975.↩
3. In Van Raden v. Commissioner, 71 T.C. 1083 (1979), on appeal (9th Cir., Sept. 18, 1979), we expressly left open the question of whether this Court would require a business purpose for prepayment in addition to the "ordinary and necessary" requirement applicable to any business expense under sec. 162. Other courts have found a requirement of business purpose for the timing of payment of business expenses unsupportable. See Mann v. Commissioner, 483 F.2d 673 (8th Cir. 1973); Cravens v. Commissioner,272 F.2d 895 (10th Cir. 1959); Gaddis v. United States, 330 F. Supp. 741 (S.D. Miss. 1971). Contra, Stice v. United States, 540 F.2d 1077 (5th Cir. 1976); Clement v. United States, 580 F.2d 422 (Ct. Cl. 1978), cert. denied 440 U.S. 907↩ (1979).