Laverne SCHENK and Margaret Schenk, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 81–4084.

United States Court of Appeals, Fifth Circuit.

Sept. 20, 1982.

Ronald D. Nickum, Donald R. Ham, Michael C. Lynch, Amarillo, Tex., for petitioners-appellants.

Glenn L. Archer, Jr., Asst. Atty. Gen., Carleton D. Powell, Michael L. Paup, William A. Whitledge, Chief, Appellate Section, Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before BROWN, GOLDBERG and POLITZ, Circuit Judges.

GOLDBERG, Circuit Judge:

"To every thing there is a season, and a time to every purpose under the heaven: A time to be born, and a time to die; a time to plant, and a time to pluck up that which is planted;"[1] a time to purchase fertilizer, and a time to take a deduction for that which is purchased. In this appeal from a Tax Court decision, we are asked to determine when the time for taking a fertilizer deduction should be.

## I. FACTS

Taxpayer-appellant LaVerne Schenk[2] is a Texas farmer who raises wheat and milo and "runs a few cattle." For several years, Mr. Schenk has been an officer[3] and member of the Dawn Agricultural Cooperative, an organization which sells farm supplies[4] and personal consumption items[5] to its members.

Each year, Mr. Schenk buys substantial amounts of fertilizer, farm supplies, and groceries from the Cooperative. Throughout the early 1970's, it was his practice to "prepay" for many of these purchases. Each December, Mr. Schenk would deliver a check to the Cooperative to cover the cost of fertilizer and supplies delivered and consumed during the following year.

In accord with his standard practice, Mr. Schenk delivered a $25,000 check to the Cooperative on December 30, 1975. This check bore a notation indicating that $20,000 was to be used for the purchase of approximately 100 tons of fertilizer and $5,000 would be for "general supplies." Upon receipt of Schenk's check, the Cooperative credited these "payments" to separate "fertilizer" and "general supply" accounts that it maintained for each of its members.

During the following year, Schenk actually took delivery of $20,000 worth of fertilizer which was charged against his "fertilizer" account. He also purchased farm supplies and personal consumption items which were charged against his "general supply" account.

Once Schenk had made the $25,000 expenditure, he could not receive a cash refund. However, in making his "prepayment" Schenk was *not* irrevocably committing himself to the purchase of specific goods within a limited span of time. If a Cooperative member ordered supplies or groceries and his general supply account balance could not cover the cost of the purchase, funds would be transferred from the member's fertilizer account into his general supply account.[6] Similarly, if a member ordered fertilizer and his fertilizer account balance would not cover the purchase, the fertilizer shipment would be charged against his general supply account.[7] Moreover, if annual purchases of fertilizer, supplies, or groceries did not exhaust the amounts prepaid, any outstanding balances could be carried forward to cover the cost of purchases made in future years. Thus, while Schenk characterized his December

---

1. *Ecclesiastes*, ch. 3.

2. Margaret Schenk is a party to these proceedings only because she files joint income tax returns with her husband LaVerne.

3. During the tax year here in question, 1975, Mr. Schenk served as President of the Dawn Cooperative.

4. The taxpayers purchased fertilizer, seed, feed, fuel, tools, parts, and chemicals from the Cooperative.

5. The taxpayers annually purchased several hundred dollars worth of soft drinks, pet food, and groceries from the Cooperative.

6. For example, in December of 1973, Schenk paid $23,000 to the Cooperative, all of which was credited to his "fertilizer" account. However, during the following year, about $3400 was transferred from his fertilizer account to his "general supply" account in order to cover the cost of supplies and goods other than fertilizer. Similarly, in December of 1974, Schenk paid $20,000 to the Cooperative, all of which was credited to his fertilizer account. However, during the following year, over $10,000 was transferred from his fertilizer account to his general supply account.

7. In 1975, several thousand dollars worth of Schenk's fertilizer purchases were charged against his general supply account.

1975 expenditure as a "fertilizer prepayment," he had not irrevocably committed himself to the purchase of fertilizer in the following calendar year. If he chose not to take delivery of fertilizer during 1976, he could have purchased other farm supplies or personal consumption items and charged the cost of these goods against his "fertilizer account" balance. If he chose not to make any purchases in the following year, his outstanding balances could have been carried forward and used to fund purchases of goods delivered far in the future.

Although the Schenks chose to pay for their annual purchases in advance, their decision to prepay did not secure any special business advantage. The Cooperative did not require prepayment as a condition of membership and prepayment did not provide the Schenks with a guaranteed price.[8] While Schenk claims to have believed that prepayment might guarantee a supply of fertilizer in the event of a shortage, the Tax Court found that prepayment afforded no such benefit.[9]

## II. PROCEDURAL HISTORY

In preparing his 1975 federal income tax return, Mr. Schenk claimed the entire December 30, 1975 expenditure as a deduction from his 1975 taxable income. Although very little of that $25,000 expenditure had actually been used to pay for fertilizer or supplies delivered in 1975,[10] Schenk maintained that he could take the deduction in 1975 because he was a cash basis taxpayer and payment had been made in 1975.

As luck would have it, the Schenks' 1975 federal income tax return was selected for examination. The Internal Revenue Service took the position that the $25,000 year-end expenditure could *not* be deducted from the Schenks' 1975 income because the outlay was a mere "deposit" and not a *bona fide* "prepayment." Accordingly, the Service issued a Notice of Deficiency. In response, the Schenks elected to institute proceedings in the U. S. Tax Court.

Following a brief trial, the Tax Court made factual findings which the parties concede to be fair and accurate.[11] The Tax Court found, *inter alia*, that Mr. Schenk's 1975 year-end expenditures were nonrefundable and that during the following year he did in fact take delivery of the fertilizer and supplies he had purportedly paid for. Nevertheless, the Tax Court held that Schenk's year-end expenditure was not a deductible prepayment because at the time he made the outlay, he was not irrevocably bound to the purchase of fertilizer in the following year. Relying upon this Court's decision in *Stice v. United States*, 540 F.2d 1077 (5th Cir. 1976), the Tax Court held that because the taxpayers retained the right to purchase a wide variety of goods with the funds ostensibly earmarked for the purchase of fertilizer, the expenditure could not be characterized as a *bona fide* fertilizer prepayment.[12] Accordingly, the Tax Court upheld the Commissioner's determination of a deficiency.[13] The Schenks then brought this appeal.[14]

---

8. Accounts were charged on the basis of the price prevailing at the time of delivery, not the date of payment.

9. When shortages did occur, members received supplies on the basis of their prior year's purchases. Those few who had prepaid did not receive any special priority.

10. The Tax Court determined that only $218 of the $25,000 expenditure represented payment for farm supplies actually delivered in 1975.

11. The Tax Court's decision is set forth in *Schenk v. Commissioner*, T.C. Memo 1980–531.

12. The Tax Court has recently cited its own decision in *Schenk* as standing for the proposi-

tion that "prepayments for fertilizer cannot be characterized as a fertilizer payment when [the] taxpayer retain[s] [the] power to substitute non-fertilizer items in subsequent tax year[s]." *Keller v. Commissioner*, 79 T.C. No. 2, at n.20 (7/8/82).

13. The Schenks had claimed the entire $25,000 expenditure as a deduction from their 1975 income. The Tax Court found that only $218 represented payment for farm supplies delivered in 1975 and that the $24,782 balance was a mere deposit for future purchases. Accordingly, the Tax Court upheld the Commissioner in disallowing $24,782 of the claimed deduction.

14. The Tax Court also denied the Schenks an investment tax credit for the cost of a structure

### III. IT'S ALL IN THE TIMING: WHEN CAN THE FERTILIZER PAYMENT BE DEDUCTED?

■ There is no question but that a farmer's purchase of fertilizer is a deductible ordinary and necessary business expense.[15] The problem here is determining *when* the deduction should be taken. Fortunately, this is not a question of first impression. In *Stice v. United States*, 540 F.2d 1077 (5th Cir. 1976), this Court confronted another instance of a cash-basis Texas farmer who sought to deduct end-of-the-year expenditures as fertilizer prepayments. We find that *Stice* controls in the matter *sub judice*.

In *Stice*, a wily farmer claimed a $70,000 deduction for fertilizer and supplies supposedly purchased in December of 1969. Only about $7,000 of these supplies were actually delivered in the year of payment, while $54,162 worth of supplies were delivered during the following year, 1970. Moreover, most of the goods delivered in 1970 turned out to be different than items purportedly purchased in December of 1969. We held that the taxpayer's end-of-the-year fertilizer "purchases" were in fact "nondeductible deposits, rather than ordinary and necessary business expenses deductible in the taxable year." 540 F.2d at 1079.[16]

In reaching our decision in *Stice*, we found the standards set forth in Revenue Ruling 75–152 [17] to be quite persuasive on the question of the deductibility of prepaid agricultural expenses. In that ruling, the Commissioner stated that:

Whether a particular expenditure is a deposit or a payment depends on the facts and circumstances of each case. Where it can be shown that the expenditure is made pursuant to a binding commitment to accept delivery of a specific quantity at a fixed price, and the buyer is not entitled, under contract provision or business custom, to a refund or repurchase, the expenditure will not be considered a deposit. The following factors, although not all inclusive, are indicative of a deposit, rather than a payment: the absence of specific quantity terms; the right to refund of any unapplied credit at the termination of the contract . . . ; and the right to substitute other goods or products for the [goods] specified in the contract.
Rev. Rule 75–152.[18]

Applying the standard set forth by the Commissioner in his Revenue Ruling, this Court found that Mr. Stice had retained "the right to substitute other goods or products" for the fertilizer he had purportedly purchased. We therefore held that his

---

built during 1975. The taxpayers do not appeal from that portion of the Tax Court's decision.

**15.** I.R.C. § 162(a) provides that a taxpayer may deduct all the "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. . . ."

**16.** In *Stice*, the Commissioner allowed a deduction for the $7,000 worth of farm supplies delivered in 1969, however he disallowed the balances of the claimed deduction. The taxpayer paid the disputed tax, brought a refund suit in the U.S. District Court, and won a jury verdict. The Commissioner appealed to this Court and we reversed.

**17.** Since the tax year here in question, Rev.Rul. 75–152 has been superseded by Rev.Rul. 79–

229. However, the substantive provisions of Rev.Rul. 75–152 have been left unchanged. *Fyrsinger v. Commissioner*, 645 F.2d 523, 525 n.2 (5th Cir. 1981).

**18.** Revenue Ruling 75–152 sets forth a tripartite standard for determining whether a farmer may deduct in the year of payment the cost of farm supplies to be delivered in a subsequent tax year. First, the Commissioner demands that any expenditure for farm supplies must constitute binding prepayments, not mere deposits. Second, the Commissioner requires that there be some business purpose other than tax avoidance for the timing of the payment. Third, the deduction of prepaid costs will be challenged if it results in the "material distortion of income." *See generally* Ward, *Tax Postponement and the Cash Method Farmer: An Analysis of Revenue Ruling 75–152*, 53 Tex. L.Rev. 1119 (1975).

year-end fertilizer expenditures were mere deposits and not deductible prepayments. 540 F.2d at 1080–81.

In the case now before us, the Tax Court held that our opinion in *Stice* controlled its decision. We agree. Taxpayer-farmer Schenk, like taxpayer-farmer Stice, made large lump-sum prepayments nominally earmarked for fertilizer to be delivered in the year following payment. However, Schenk, like Stice, was never obligated to take delivery of fertilizer. Schenk, like Stice, retained the option to have his fertilizer prepayment applied to the purchase of entirely different products, even groceries or pet food. *See supra* note 6. Moreover, if his annual purchases of fertilizer, supplies, or groceries failed to exhaust the amounts prepaid, any outstanding balances could be carried forward to cover the cost of purchases made in future years. Thus, although Schenk's December 30, 1975 payment was ostensibly for the purchase of fertilizer to be delivered in 1976, he actually retained the right to use these funds for the purchase of many other products far into the future. Conceivably, Schenk could even have used the December 30, 1975 expenditure to cover the cost of soft drinks delivered in 2001.[19]

We recognize that Schenk did indeed take delivery of the fertilizer he had purportedly purchased during the final hours of 1975. Viewed with the benefit of hindsight, his 1975 expenditures might appear to have been prepayment for fertilizer and farm supplies actually delivered during the following year. However, we cannot have a rule of tax accounting in which the deductibility of important expense items turns upon events or contingencies occurring long after the close of the tax year.[20] "[S]uch retrospective adjustments based on events transpiring in subsequent years . . . [would] threaten the integrity of the annual accounting period." Ward, *Tax Postponement*, 53 Tex.L.Rev. 1119, 1143 (1975). In determining whether Mr. Schenk's year-end expenditures can be deducted from his 1975 income, we must look to the facts as they existed on December 31, 1975, the day the curtain closed on the Schenks' tax year. On that day it was by no means certain that Schenk would actually use his December 30 expenditure for the purchase of fertilizer in the following year.[21] This fact leads us to conclude that under the rule set forth in *Stice*, Schenk's December 30 expenditure was a mere deposit and not a *bona fide* prepayment.[22]

**19.** Thus, an expenditure to cover the cost of fertilizer to be purchased "some day" will not constitute a *bona fide* prepayment. There must be some chronological fixation. In this case, the Schenks' "commitment" to purchase fertilizer was so open-ended, it might even have violated the Rule Against Perpetuities if that ancient doctrine were to be applied to fertilizer conveyancing.

**20.** "All the revenue acts which have been enacted since the adoption of the Sixteenth Amendment have uniformly assessed the tax on the basis of annual returns showing the net result of all the taxpayer's transactions during a fixed accounting period." *Burnet v. Sanford & Brooks Co.*, 282 U.S. 359, 363, 51 S.Ct. 150, 151, 75 L.Ed. 383 quoted in *Security Flour Mills Co. v. C.I.R.*, 321 U.S. 281, 286, 64 S.Ct. 596, 598, 88 L.Ed. 725 (1944).

**21.** In previous years, funds nominally earmarked for "fertilizer" purchases had been intermingled with funds used to purchase a wide variety of farm supplies and personal consumption items. *See supra* note 6.

**22.** Mr. Schenk has attempted to distinguish the facts of the *Stice* case from his own situation, pointing out that the taxpayer in *Stice* used a prepayment to buy farm supplies other than the fertilizer he had ostensibly purchased, while he (Schenk) actually took delivery of the fertilizer he had paid for. Schenk now suggests that a taxpayer should be able to deduct prepaid farm expenses to the extent that the items paid for are actually delivered in the following year. However, this Court has already rejected this argument. In *Stice*, the taxpayer *did* take delivery of $13,000 worth of chemicals and fertilizer purportedly purchased in the preceding year. Nevertheless, we refused to allow Stice to deduct the $13,000 paid in 1969 for farm supplies actually delivered in 1970. Instead, we disallowed the entire prepayment.

In *Stice*, as in this case, the crucial issue was not whether the taxpayer ultimately chose to take delivery of supplies purportedly purchased in a prior year. The question was whether the taxpayer had, at the time of payment, irrevocably committed himself to the purchase of specific items within a specific year.

## IV. CONCLUSION

In the proceedings below, the Tax Court refused to allow the Schenks to deduct certain prepaid farm expenses from their 1975 taxable income. We affirm, but not without a measure of reservation. We recognize that there is nothing in this record to suggest that the taxpayers in any way intended to defraud the government or that their prepayment of farm expenses materially distorted their income in 1975. However, in a case such as this, our ruling cannot turn upon the moral quality of the individual taxpayer's conduct. The Code, with all of its permutations and cross-references, cannot be applied on an *ad hominem* or *ad hoc* basis. Principals of tax accounting cannot be tailor-made or customized to suit the needs of individual taxpayers. For better or for worse, ours is a system of laws and not men. We therefore must endeavor to fashion rules of general application which provide practical guidelines for taxpayers and collectors and which will prevent the unscrupulous from abusing the system.

Annualization is a fundamental tenent of our tax system, a keystone of our fiscal framework. At the end of each tax year, the curtain falls and the year's transactions are reviewed. At that time, the taxpayer and tax collector must be able to look back over the year's activity and determine with certainty whether or not a given expenditure constitutes a deductible expense. For this reason, a taxpayer must leave certain indelible transactional tracks for the tax collector to follow.

A payment cannot be characterized as a deductible fertilizer expense until it is clear that the expenditure will actually be used for the purchase of fertilizer. Because the taxpayers in this case retained the power to substitute nonfertilizer, nondeductible items in the years following their purported "prepayment," we conclude that their expenditure cannot be characterized as a *bona fide* fertilizer prepayment. For this reason, the decision of the Tax Court must be and is hereby

AFFIRMED.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.