**GOLDEN ROD FARMS, INC., Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

Civ. No. 82–HM–5721–NE.

United States District Court,
N.D. Alabama,
Northeastern Division.

Dec. 31, 1986.

Stephen P. Parsons, Stoppel, Caldwell and Heggie, P.C., Chattanooga, Tenn., John C. Mooney, Wagner and Myers, Knoxville, Tenn., Jack Livingston, Gerald R. Paulk, Livingston, Porter & Paulk, P.C., Scottsboro, Ala., for plaintiff.

Frank M. Donaldson, U.S. Atty., Caryl P. Privett, Asst. U.S. Atty., Birmingham, Ala., Curtis L. Muncy, Helen M. Lokey, Dept. of Justice, Tax. Div., Washington, D.C., for defendant.

## MEMORANDUM OF DECISION

HALTOM, District Judge.

The above entitled civil action presents the issue of whether substantial prepayments made by a corporate farmer taxpayer near the end of certain of its tax years for chicken feed or feed ingredients to be delivered and used in the taxpayer's broiler grow out operation in the year following purchase constituted nondeductible deposits in the tax years made rather than ordinary and necessary business expenses incurred in such years pursuant to 26 U.S.C. § 162(a) and regulations and revenue rulings promulgated thereunder.

This case was filed by Plaintiff GOLDEN ROD FARMS, INC. ("Golden Rod Farms";

"corporate taxpayer"; "taxpayer"), a farming corporation organized and existing under the laws of the State of Alabama which has as its principal business activity the growing of broilers for resale in an integrated broiler growing operation involving other closely related and affiliated family owned corporations,[1] against the UNITED STATES OF AMERICA ("government") for refund of interest on federal income tax alleged to have been illegally and erroneously assessed against and paid by the corporate taxpayer.

By Consent Order entered herein the parties stipulated that the case should be submitted to the Court on cross motions for summary judgment. In connection therewith the corporate taxpayer and the government have filed an agreed Stipulation of Facts with Exhibits "A" and "B" thereto attached. Clarifying Affidavits of Forrest H. Ingram, President and Chief Executive Officer of Golden Rod Farms [dated July 25, 1985 and received by the Court on August 1, 1985; and second Affidavit dated August 29, 1985 and received by the Court on September 9, 1985] were submitted in support of the taxpayer's motion for summary judgment and in opposition to the government's motion for summary judgment and have been treated and considered by the Court as timely and properly filed.

The issue presented for decision is framed by the corporate taxpayer as follows:

> May the Defendant disallow a current deduction for the purchase of feed not used until the fiscal year following the fiscal year of purchase taken by a farmer using the cash method of tax accounting?

The taxpayer in brief asserts that a deduction for feed used in the year following the

year of purchase may be taken in the year of purchase by a cash method taxpayer engaged in the business of farming when the purchase was a true purchase and not a refundable deposit, the purchase was made for a valid business purpose, and the deduction does not result in a material distortion of income, thus meeting the three part test of Rev.Rul. 79–229, 1979–2 C.B. 210 which reads in summarized form:

> *First*, the expenditure for the feed must be a payment for the purchase of feed rather than a deposit; *second*, the prepayment must be made for a business purpose and not merely for tax avoidance; and *third*, the deduction for such costs in the taxable year of prepayment must not result in material distortion of income.

This referenced revenue ruling is called the "feeder tax shelter" whose objective is to defer taxation by way of immediate deduction for feed purchased in one year and disposed of in another. Rabkin & Johnson, Federal Income, Gift and Estate Taxation, § 13.01(5).

In brief the government agrees that Revenue Ruling 79–229 is applicable for a farmer on the cash method of accounting who desires to deduct the expense of feed which will be consumed in a taxable year which is subsequent to the year of purchase, concedes that this corporate taxpayer qualifies as a cash basis farmer within the purview of such ruling, submits that Revenue Ruling 79–229 requires all three tests above referenced to be satisfied, and argues that in the instant case Golden Rod Farms fails to meet the prescribed tests, thus mandating that the deductions for prepaid feed expenses which taxpayer took in its taxable years ending in 1974 and 1976 be disallowed.

---

**1.** The corporations as a group produce the chicken eggs, hatch the eggs, grow the chicks into broilers, produce feed for the chicks, process the broilers by killing and cleaning them and selling the dressed broilers to third parties outside the integrated group. Each phase of this process is handled by a separate corporation. During Golden Rod Farms' fiscal years

ended July 29, 1974 and July 3, 1976 the other corporations involved in the integrated operations included Ingram Farms, Inc., FHI Farms, Inc., Golden Rod Egg Supply, Inc., Golden Rod Hatchery, Inc., Golden Rod Feed Mill, Inc., Golden Rod Broilers, Inc., and Golden Rod Gas, Inc. (Stipulation of Facts No. 2 and No. 8).

Before proceeding with an analysis of the stipulated facts and the clarifying facts of the Forrest H. Ingram Affidavits, the Court takes note that a cash-method taxpayer engaged in the business of farming is allowed to deduct amounts paid for feed purchased for use in its farming operation as an ordinary and necessary business expense under Section 162 of the Internal Revenue Code ("Code"). Such a deduction may generally be made in the year of purchase pursuant to Section 461 of the Code. See Treas.Reg. Section 1–461–1(a)(1). There are certain exceptions to this general rule for the deduction by a farmer of purchases of feed that is consumed in a taxable year following the year of purchase. These exceptions have evolved into the three-part test referred to above to determine whether the cost of feed that is consumed in a subsequent taxable year may be deducted in the year of purchase. This test is summarized in Revenue Ruling 79–229, ante, relied upon by both the taxpayer and the government in this controversy.

## AGREED AND CLARIFIED FACTS

A recitation of the stipulated facts and the facts clarified by the Forrest H. Ingram Affidavits is considered desirable at this juncture to facilitate ease of understanding the resolution hereafter made by the Court of the issues presented for decision.

## STIPULATION OF FACTS

3. During the fiscal years ended June 29, 1974 and July 3, 1976 all of the capital stock of Golden Rod Egg Supply, Inc., Golden Rod Hatchery, Inc., Golden Rod Feed Mill, Inc., Golden Rod Farms, Inc., and Golden Rod Broilers, Inc. was owned by Ingram Farms, Inc. During such periods the common capital stock of Golden Rod Gas, Inc. was owned equally by Mary Fay Ingram and William F. Ingram. During such periods the common capital stock of FHI Farms, Inc. was owned by Forrest H. Ingram. (Stipulation of Fact No. 3)

4. During the fiscal years ended June 29, 1974 and July 3, 1976 the capital stock of Ingram Farms, Inc. was owned as follows:

(a) Shares of voting common stock—

255 owned by Ingram Trust # 1
255 owned by Ingram Trust # 2
245 owned by William F. Ingram
245 owned by Mary Fay Ingram
1000

(b) Shares of Class B nonvoting common stock—

2500 owned by Mary Fay Ingram
2500 owned by William F. Ingram
5000

(c) Shares of 6% preferred stock—

15,220 total shares owned by Forrest H. Ingram

(Stipulation of Fact No. 4)

5. Forrest H. Ingram is President and a member of the Board of Directors of [Golden Rod Farms]. Forrest H. Ingram is also President and a Director of Golden Rod Egg Supply, Inc., Golden Rod Hatchery, Inc., Golden Rod Broilers, Inc. and Golden Rod Feed Mill, Inc. Until the merger of FHI Farms, Inc. with Ingram Farms, Inc., Forrest H. Ingram was also President and a Director of FHI Farms, Inc. William F. Ingram and Mary Faye Ingram, the son and daughter, are also officers and members of the Board of Directors of [Golden Rod Farms]. Other members of the Board of Directors during the fiscal years ending June 29, 1974 and July 3, 1976 included Ruby T. Ingram and Finis St. John, Jr. (Stipulation of Fact No. 5)

6. The integrated broiler growing operation of Ingram Farms, Inc. and related companies consisted of the following operations during the fiscal year ended June 29, 1974 and July 3, 1976:

(a) Golden Rod Egg Supply, Inc. purchases "Broiler Breeders" baby chicks from third parties which are raised and kept as laying hens which lay hatching eggs. The hatching eggs laid by the hens owned by Golden Rod Egg Supply, Inc. are generally sold to Golden Rod Hatchery, Inc.

(b) Golden Rod Feed Mill, Inc. purchases feed ingredients and other additives from third parties which are mixed into

various types of feed. Golden Rod Feed Mill, Inc. sometimes uses feed ingredients purchased by [Golden Rod Farms] or other related corporations, in which event the corporation which purchased the feed ingredients is given credit for the fair market price of the feed ingredients used by Golden Rod Feed Mill, Inc. on the date that such ingredients are used in the feed being processed. Processed feed was generally sold by Golden Rod Feed Mill, Inc. to Golden Rod Egg Supply, Inc., [Golden Rod Farms], Ingram Farms, Inc. and FHI Farms, Inc. during the fiscal years ended June 29, 1974 and July 3, 1976.

(c) Golden Rod Hatchery, Inc. purchases hatching eggs from Golden Rod Egg Supply, Inc. which are hatched. The day-old baby chicks hatched by Golden Rod Hatchery, Inc. are sold to the grow out companies which during the fiscal years ended June 29, 1974 and July 3, 1976 included [Golden Rod Farms], Ingram Farms, Inc., and FHI Farms, Inc.

(d) The grow out companies which during fiscal years ended June 29, 1974 and July 3, 1976 included [Golden Rod Farms], Ingram Farms, Inc. and FHI Farms, Inc. purchased baby chicks from Golden Rod Hatchery, Inc. and purchased feed from Golden Rod Feed Mill, Inc. On occasion feed ingredients were purchased from third parties. The grow out companies raised the baby chicks until such time as they were ready to be sold as meat at which time the grow out companies sold the live broilers to Golden Rod Broilers, Inc. Golden Rod Broilers, Inc. purchases live broilers from [Golden Rod Farms], Ingram Farms, Inc. and FHI Farms, Inc. which are killed and cleaned, with the dressed broilers being sold to third parties outside the integrated group.

(f) Golden Rod Gas, Inc. sells gas to various corporations in the group. (Stipulation of Fact No. 6)

7. [Golden Rod Farms] computes its taxable income for U.S. income tax purposes on the cash basis of accounting, and it has elected a 52- or 53-week fiscal year ending on the nearest Saturday to June 30. (Stipulation of Fact No. 7)

8. Golden Rod Feed Mill, Inc. computes its taxable income on the accrual basis of accounting and it has elected a 52- or 53-week fiscal year ending on the nearest Saturday to June 30. (Stipulation of Fact No. 8)

9. During its fiscal year ended June 29, 1974, [Golden Rod Farms] purchased and paid for feed and feed ingredients in the amount of $11,557,525.00 and deducted the cost of the feed and feed ingredients on its U.S. corporate income tax return for the tax year ended June 29, 1974. Of this total amount, feed ingredients in the amount of $1,449,525.00 were not received by [Golden Rod Farms] during the year ended June 29, 1974. These feed ingredients in the amount of $1,449,525.00 were received and used by [Golden Rod Farms] on or before November 1, 1974. The feed ingredients were actually delivered to Golden Rod Feed Mill, Inc. which mixed the feed ingredients with various additives. The processed feed would then be delivered by Golden Rod Feed Mill, Inc. to [Golden Rod Farms] which would then use the feed in its operations to feed its chickens. (Stipulation of Fact No. 9)

10. Pursuant to an oral agreement, Golden Rod Feed Mill, Inc. gave [Golden Rod Farms] credit in the amount of $1,626,530.02 for the feed ingredients purchased by Golden Rod during the tax year ended June 29, 1974 in the amount of $1,449,525.00, when the ingredients were used in the next fiscal year. The credit of $1,626,530.00 was based on the market price of the ingredients on the date the ingredients were used. (Stipulation of Fact No. 10)

11. For the fiscal year ended June 29, 1974, feed ingredients constituted approximately 96% of the total cost of feed processed by Golden Rod Feed Mill, Inc. (Stipulation of Fact No. 11)

12. The deduction by [Golden Rod Farms] of the feed ingredients in the amount of $1,449,525.00 purchased by [Golden Rod Farms] during its tax year

ended June 29, 1974, and received and used in the following tax year was disallowed by an examining agent of the Internal Revenue Service and a tax deficiency was assessed against [Golden Rod Farms] for the tax year ended June 29, 1974, in the amount of $635,599.22, which assessment was paid by [Golden Rod Farms] on October 8, 1976. On October 8, 1976, [Golden Rod Farms] also paid interest on the tax deficiency in the amount of $89,364.68. (Stipulation of Fact No. 12)

13. The additional tax of $635,599.22 assessed against [Golden Rod Farms] for the tax year ended June 29, 1974, was refunded to [Golden Rod Farms] with interest from July 2, 1977, to the date of payment as a result of a net operating loss incurred by [Golden Rod Farms] for the tax year ended July 2, 1977. No part of the interest in the amount of $89,364.68 paid by [Golden Rod Farms] has been refunded to [Golden Rod Farms]. [Golden Rod Farms] was not paid any interest on the amount of the tax deficiency of $635,599.22 for the period from the date of payment October 8, 1976, to July 2, 1977. (Stipulation of Fact No. 13)

14. The purchase by [Golden Rod Farms] of feed ingredients in the amount of $1,449,525.00 during its tax year ended June 29, 1974, received and used in the following tax year, was a genuine purchase of feed ingredients from third parties rather than a mere deposit with third parties or other conditional purchase. (Stipulation of Fact No. 14)

15. The purchase by [Golden Rod Farms] of feed ingredients in the amount of $1,449,525.00 during its tax year ended June 29, 1974, received and used in the following tax year, was made in order to assure an adequate supply of feed and in order to fix the price of feed ingredients at the price in effect at the end of the fiscal year ending June 29, 1974. (Stipulation of Fact No. 15)

16. During its tax year ended July 3, 1976, [Golden Rod Farms] purchased and paid for feed and feed ingredients in the amount of $12,225,961.32, and deducted the cost of the feed and feed ingredients on its U.S. corporate income tax return for the tax year ended July 3, 1976. Of this total amount, feed ingredients in the amount of $3,192,899.75 were not received by [Golden Rod Farms] during the year ended July 3, 1976. These feed ingredients in the amount of $3,192,899.75 were received and used by [Golden Rod Farms] on or before December 1, 1976. The feed ingredients were actually delivered to Golden Rod Feed Mill, Inc. which mixed the feed ingredients with various additives. The processed feed would then be delivered by Golden Rod Feed Mill, Inc. to [Golden Rod Farms] which would then use the feed in its operations to feed its chickens. (Stipulation of Fact No. 16)

17. Pursuant to an oral agreement, Golden Rod Feed Mill, Inc., gave [Golden Rod Farms] credit in the amount of $3,222,596.85 for the feed ingredients purchased by [Golden Rod Farms] during the tax year ended July 3, 1976 in the amount of $3,192,899.75, when the ingredients were used in the next fiscal year. The credit of $3,222,596.85 was based on the market price of the ingredients on the date the ingredients were used. (Stipulation of Fact No. 17)

18. For the fiscal year ended July 3, 1976, feed ingredients constituted approximately 96% of the total cost of feed processed by Golden Rod Feed Mill, Inc. (Stipulation of Fact No. 18)

19. The deduction by [Golden Rod Farms] of the feed ingredients in the amount of $3,192,899.75 purchased by [Golden Rod Farms] during its tax year ended July 3, 1976, and received and used in the following tax year was disallowed by an examining agent of the Internal Revenue Service and a tax deficiency was assessed against [Golden Rod Farms] for the tax year ended July 3, 1976. (Stipulation of Fact No. 19)

20. The additional tax assessed against [Golden Rod Farms] for the tax year ended July 3, 1976, was eliminated by net operating losses incurred in subsequent years so that the additional tax did not have to be paid; however, [Golden Rod Farms] was required to pay interest on the tax deficien-

cy in the amount of $130,086.78, which was paid by [Golden Rod Farms] on April 1, 1981. (Stipulation of Fact No. 20)

21. No part of the interest in the amount of $130,086.78 paid by [Golden Rod Farms] on the tax deficiency for the tax year ended July 3, 1976, has been refunded or credited to [Golden Rod Farms]. (Stipulation of Fact No. 21)

22. The purchase by [Golden Rod Farms] of feed ingredients in the amount of $3,192,899.75 during its tax year ended July 3, 1976, received and used in the following tax year, was a genuine purchase of feed ingredients from third parties and not a mere deposit with third parties or other conditional purchase. (Stipulation of Fact No. 22)

23. The purchase by [Golden Rod Farms] of the feed ingredients in the amount of $3,192,899.75 during its tax year ended July 3, 1976, received and used in the following tax year, was made by [Golden Rod Farms] in order to assure an adequate supply of feed and in order to fix the price for the feed ingredients at the price in effect at the end of the fiscal year ending July 3, 1976. (Stipulation of Fact No. 23)

24. In addition to the two fiscal years at issue in this case, [Golden Rod Farms] has purchased feed ingredients in a number of other taxable years for use during the following fiscal year including:

| Fiscal Year Ending | Amount of Feed Ingredients Purchased for Use in Following Fiscal Year |
|---|---|
| 6–28–75 | 428,775.00 |
| 7–02–77 | 2,466,061.00 |
| 7–01–78 | 1,196,775.00 |
| 6–30–79 | 1,464,525.00 |
| 6–28–80 | –0– |
| 6–27–81 | 513,525.00 |
| 7–03–82 | 562,000.00 |

(Stipulation of Fact No. 24)

25. The monthly purchases of feed or feed ingredients by [Golden Rod Farms] for the taxable years ending in 1973 through 1978 are as follows:

| Month | Payment to Golden Rod Feed Mill, Inc. | Payment to Others | Total |
|---|---|---|---|
| 7–72 | 830,000.00 | –0– | 830,000.00 |
| 8–72 | 775,000.00 | –0– | 775,000.00 |
| 9–72 | 490,000.00 | –0– | 490,000.00 |
| 10–72 | 510,000.00 | –0– | 510,000.00 |
| 11–72 | 150,000.00 | –0– | 150,000.00 |
| 12–72 | 115,000.00 | –0– | 115,000.00 |
| 1–73 | 300,000.00 | –0– | 300,000.00 |
| 2–73 | 520,000.00 | –0– | 520,000.00 |
| 3–73 | 245,000.00 | –0– | 245,000.00 |
| 4–73 | 660,000.00 | –0– | 660,000.00 |
| 5–73 | 1,085,000.00 | –0– | 1,085,000.00 |
| 6–73 | 1,725,000.00 | –0– | 1,725,000.00 |
| | 7,405,000.00 | –0– | 7,405,000.00 |
| 7–73 | 1,435,000.00 | –0– | 1,435,000.00 |
| 8–73 | 2,390,000.00 | –0– | 2,390,000.00 |
| 9–73 | 1,845,000.00 | –0– | 1,845,000.00 |

| Month | Payment to Golden Rod Feed Mill, Inc. | Payment to Others | Total |
|---|---|---|---|
| 10–73 | 1,215,000.00 | –0– | 1,215,000.00 |
| 11–73 | 125,000.00 | –0– | 125,000.00 |
| 12–73 | 225,000.00 | –0– | 225,000.00 |
| 1–74 | 60,000.00 | –0– | 60,000.00 |
| 2–74 | 200,000.00 | –0– | 200,000.00 |
| 3–74 | 610,000.00 | –0– | 610,000.00 |
| 4–74 | 803,000.00 | –0– | 803,000.00 |
| 5–74 | 1,375,000.00 | 158,130.00 | 1,533,130.00 |
| 6–74 | 325,000.00 | 1,291,395.00 | 1,616,395.00 |
| | 10,608,000.00 | 1,449,525.00 | 12,057,525.00 |
| | ( 500,000.00) | | ( 500,000.00) |
| | 10,108,000.00 | | 11,557,525.00 |
| 7–74 | 660,000.00 | –0– | 660,000.00 |
| 8–74 | 675,000.00 | –0– | 675,000.00 |
| 9–74 | 1,195,000.00 | 4,160.60 | 1,199,160.60 |
| 10–74 | 750,000.00 | 16,185.61 | 766,185.61 |
| 11–74 | 665,000.00 | 2,744.30 | 667,744.30 |
| 12–74 | 375,000.00 | –0– | 375,000.00 |
| 1–75 | 690,000.00 | –0– | 690,000.00 |
| 2–75 | –0– | –0– | –0– |
| 3–75 | 335,000.00 | –0– | 335,000.00 |
| 4–75 | 1,045,000.00 | –0– | 1,045,000.00 |
| 5–75 | 1,330,000.00 | –0– | 1,330,000.00 |
| 6–75 | 660,000.00 | 428,775.00 | 1,088,775.00 |
| | 8,380,000.00 | 451,865.51 | 8,831,865.51 |
| 7–75 | 1,195,000.00 | –0– | 1,195,000.00 |
| 8–75 | 805,000.00 | –0– | 805,000.00 |
| 9–75 | 1,155,000.00 | 3,061.57 | 1,158,061.57 |
| 10–75 | 1,125,000.00 | –0– | 1,125,000.00 |
| 11–75 | 470,000.00 | –0– | 470,000.00 |
| 12–75 | 725,000.00 | –0– | 725,000.00 |
| 1–76 | 300,000.00 | –0– | 300,000.00 |
| 2–76 | 525,000.00 | –0– | 525,000.00 |
| 3–76 | 200,000.00 | –0– | 200,000.00 |
| 4–76 | 1,250,000.00 | –0– | 1,250,000.00 |
| 5–76 | 785,000.00 | –0– | 785,000.00 |
| 6–76 | 495,000.00 | 3,192,899.75 | 3,687,899.75 |
| | 9,030,000.00 | 3,195,961.32 | 12,225,961.32 |
| 7–76 | 830,000.00 | –0– | 830,000.00 |
| 8–76 | 465,000.00 | –0– | 465,000.00 |
| 9–76 | 325,000.00 | –0– | 325,000.00 |
| 10–76 | 1,150,000.00 | 5,924.96 | 1,155,924.96 |
| 11–76 | 550,000.00 | 1,576.00 | 551,576.00 |
| 12–76 | 640,000.00 | 11,641.75 | 651,641.75 |
| 1–77 | 515,000.00 | –0– | 515,000.00 |
| 2–77 | –0– | –0– | –0– |
| 3–77 | 1,180,000.00 | 359,705.00 | 1,539,705.00 |
| 4–77 | 900,000.00 | 383,868.00 | 1,283,868.00 |
| 5–77 | 1,090,000.00 | 1,035.99 | 1,091,035.99 |
| 6–77 | 75,000.00 | 2,850,175.00 | 2,925,175.00 |
| | 7,720,000.00 | 3,613,926.70 | 11,333,926.70 |
| 7–77 | 1,040,000.00 | 270.40 | 1,040,270.40 |
| 8–77 | 980,000.00 | –0– | 980,000.00 |

| Month | Payment to Golden Rod Feed Mill, Inc. | Payment to Others | Total |
|---|---|---|---|
| 9–77 | 895,000.00 | –0– | 895,000.00 |
| 10–77 | 725,000.00 | –0– | 725,000.00 |
| 11–77 | 975,000.00 | 1,514.89 | 976,514.89 |
| 12–77 | 475,000.00 | –0– | 475,000.00 |
| 1–78 | 1,220,000.00 | –0– | 1,220,000.00 |
| 2–78 | 175,000.00 | 9,681.76 | 184,681.76 |
| 3–78 | 550,000.00 | –0– | 550,000.00 |
| 4–78 | 665,000.00 | –0– | 665,000.00 |
| 5–78 | 935,000.00 | –0– | 935,000.00 |
| 6–78 | 1,660,000.00 | 1,196,775.00 | 2,856,775.00 |
| | 10,295,000.00 | 1,208,242.05 | 11,503,242.05 |

(Stipulation of Fact No. 25)

26. Sales, cost of goods sold, gross income and taxable income and federal income tax for Golden Rod for the taxable years ending in 1973 through 1978 were reported by Golden Rod on its original U.S. income tax returns as shown on the attached Exhibit A. (Stipulation of Fact No. 26)

27. Sales, cost of goods sold, gross income and taxable income for Golden Rod Feed Mill, Inc. for the taxable years ending in 1973 through 1978 were reported by the corporation on its U.S. income tax returns as shown on the attached *Exhibit B*. (Stipulation of Fact No. 27)

28. Taxable income and Federal income tax for Golden Rod for the taxable years ending in 1973 through 1978 as adjusted by the Internal Revenue Service was as follows:

| Year Ended | Taxable Income | Income Tax |
|---|---|---|
| 6–30–73 | 338,350.10 | 101,515.07 |
| 6–29–74 | –0– | 1,561.00 (1) |
| 6–28–75 | (67,963.84) | –0– |
| 7–03–76 | 111,456.88 | 23,468.61 |
| 7–02–77 | (2,551,145.88) | 633.01 (1) |
| 7–01–78 | (1,631,990.53) | 647.80 (1) |

(1) Tax on recapture of investment credit.

(Stipulation of Fact No. 28)

29. Golden Rod has timely filed claims and amended claims for refund together with forms 1120X for the taxable years ended June 29, 1974, and July 3, 1976. However, the defendant reserves its right to challenge the sufficiency of the claims and amended claims on appeal. (Stipulation of Fact No. 29)

### EXHIBIT A TO STIPULATION OF FACTS

| Year Ended | Gross Sales | Cost of Goods Sold | Gross Income | Taxable Income | Income Tax |
|---|---|---|---|---|---|
| 6–30–73 | 11,713,892.28 | 9,195,000.00 | 2,518,892.28 | 520,641.04 | 201,726.50 |
| 6–29–74 | 15,453,788.01 | 13,592,525.00 | 2,061,246.50 | (95,226.08) | 1,561.00 |
| 6–28–75 | 13,156,011.28 | 10,896,628.40 | 2,259,382.88 | 10,539.46 | 2,965.65 |
| 7–03–76 | 17,168,438.08 | 14,899,736.32 | 2,494,092.80 | (67,414.51) | –0– |
| 7–02–77 | 15,693,689.31 | 13,996,792.29 | 1,890,084.97 | (1,151,080.30) | 633.01 |
| 7–01–78 | 16,813,051.12 | 14,237,465.89 | 2,575,585.23 | (385,368.60) | 647.80 |

### EXHIBIT B TO STIPULATION OF FACTS

| Year Ended | Gross Sales | Cost of Goods Sold | Gross Income | Taxable Income |
|---|---|---|---|---|
| 6–30–73 | 18,380,287.58 | 18,155,958.36 | 224,329.22 | (359,341.32) |
| 6–29–74 | 26,457,323.06 | 25,657,086.30 | 800,236.76 | 210,216.86 |
| 6–28–75 | 22,121,170.18 | 21,549,688.82 | 571,481.36 | (9,960.88) |
| 7–03–76 | 23,651,058.65 | 22,727,800.61 | 923,258.04 | 234,331.67 |
| 7–02–77 | 23,088,724.65 | 22,543,681.35 | 545,043.30 | (272,802.56) |
| 7–01–78 | 24,264,537.41 | 23,832,809.69 | 431,727.72 | (359,742.25) |

### CLARIFYING FACTS FROM FIRST AFFIDAVIT OF FORREST H. INGRAM

1. At all time from the beginning of the fiscal year ended June 29, 1974 until the present time I have been President and Chief Executive Officer of Golden Rod Farms, Inc. ("Golden Rod") and Golden Rod Feed Mill, Inc.

2. During the fiscal year ended June 29, 1974 until the present time, Golden Rod Feed Mill, Inc. has capacity to store feed ingredients for approximately one day's production of feed

3. Golden Rod Feed Mill, Inc. did not given [sic] Golden Rod a credit on its books for the feed ingredients belonging to Golden Rod which were used by Golden Rod Feed Mill, Inc. in processing feed. The credit given by Golden Rod Feed Mill, Inc. was to reduce the amount which Golden Rod paid for feed during the period that the feed ingredients belonging to Golden Rod were used by Golden Rod Feed Mill, Inc. by an amount equal to the market value of the ingredients when used by Golden Rod Feed Mill, Inc.

4. The feed ingredients in question of $1,449,525.00 for the year ended June 29, 1974 and $3,192,899.75 for the year ended July 3, 1976 were at the request of the purchaser, Golden Rod shipped directly to the feed mill of Golden Rod Feed Mill, Inc. in the following fiscal year. Golden Rod Feed Mill, Inc. mixed the ingredients belonging to Golden Rod with other ingredients belonging to Golden Rod Feed Mill, Inc. into processed feed. Such processed feed including the ingredients purchased by Golden Rod Farms, Inc. in the preceding fiscal year was delivered to Golden Rod Farms, Inc. immediately. The amount which Golden Rod Farms, Inc. was required to pay to Golden Rod Feed Mill, Inc. for the processed feed was reduced by an amount equal to the fair market value of such ingredients on the date such ingredients were used. Accordingly, the net amount which Golden Rod Farms, Inc. was required to pay to Golden Rod Feed Mill, Inc. for processed feed was reduced by $1,626,530.02 for feed purchased during the year ended June 28, 1975 and by $3,222,596.85 for feed purchased during the year ended July 2, 1977.

5. The feed ingredients purchased by Golden Rod Farms, Inc. in the amount of $1,449,525.00 during the year ended June 29, 1974 and $3,192,899.75 during the year ended July 3, 1976 could have been resold by Golden Rod Farms, Inc. on the open market or delivered to another mill for processing into processed feed.

### ADDITIONAL CLARIFYING FACTS FROM SECOND AFFIDAVIT OF FORREST H. INGRAM

1. At all times during the fiscal year ended June 29, 1974 and July 3, 1976, I was President and Chief Executive Officer of Golden Rod Farms, Inc.

2. The feed ingredients or feed purchased by Golden Rod Farms, Inc. during the year ended June 29, 1974 which were not delivered until the next tax year of Golden Rod Farms, Inc. consisted of the following:

| Description | Amount |
|---|---|
| Corn | $1,016,500.00 |
| Soy Meal | 159,425.00 |
| Poultry Meal | 90,000.00 |
| Poultry Fat | 183,600.00 |
| Total | $1,449,525.00 |

3. The feed ingredients or feed purchased by Golden Rod Farms, Inc. during the year ended June 29, 1976 which were not delivered until the next tax year of Golden Rod Farms, Inc. consisted of the following:

4. The feed or feed ingredients purchased by Golden Rod Farms, Inc. during the year ended June 29, 1974 and not delivered until the next tax year were purchased by Golden Rod Farms, Inc. as follows:

| Description | Amount |
|---|---|
| Corn | $1,349,873.75 |
| Soy Meal | 1,483,026.00 |
| Poultry Meal | 99,000.00 |
| Poultry Fat | 261,000.00 |
| Total | $3,192,899.75 |

| Date | Seller | Amount |
|---|---|---|
| June 28, 1974 | Cargill, Inc. | 1,295.00 |
| June 28, 1974 | Cargill, Inc. | 232,875.00 |
| June 28, 1974 | Pillsbury | 155,875.00 |
| June 28, 1974 | Cargill, Inc. | 63,750.00 |
| June 12, 1974 | Poultry By-Products | 273,600.00 |
| June 5, 1974 | Cargill, Inc. | 564,000.00 |
| May 29, 1974 | Cargill, Inc. | 158,130.00 |
| Total | | $1,449,525.00 |

None of the sellers are related to Golden Rod Farms, Inc.

5. The feed or feed ingredients purchased by Golden Rod Farms, Inc. during the year ended July 3, 1976 and not delivered until the next tax year were purchased by Golden Rod Farms, Inc. as follows:

| Date | Seller | Amount |
|---|---|---|
| June 30, 1976 | Poultry By-Products | 360,000.00 |
| June 17, 1976 | Cargill, Inc. | 312,865.00 |
| June 17, 1976 | Continental Grain Co. | 259,610.00 |
| June 17, 1976 | Owensboro Grain Co. | 220,176.00 |
| June 21, 1976 | Gold Kist Oil Products | 256,500.00 |
| June 11, 1976 | Pillsbury Company | 229,600.00 |
| June 11, 1976 | Continental Grain Co. | 290,250.00 |
| June 11, 1976 | Continental Grain Co. | 143,625.00 |
| June 7, 1976 | Cargill, Inc. | 344,200.00 |
| June 7, 1976 | Central States Grain | 502,923.75 |
| June 7, 1976 | Pillsbury Company | 273,150.00 |
| Total | | $3,199,899.75 |

None of the sellers are related to Golden Rod Farms, Inc.

2. The term feed ingredients includes corn, soybean meal, poultry fat and poultry meal purchased by taxpayer. The term feed is interpreted to mean corn, soybean meal, poultry fat and poultry meal. Vitamins and feed supplements

WERE THE PURCHASES OF FEED AND FEED INGREDIENTS [2] BY GOLDEN

are generally mixed with these items of feed prior to feeding of Golden Rod Farms' poultry (Plaintiff's Answer No. 3 to Interrogatory No. 3 of Second Set of Interrogatories of Defendant)

ROD FARMS FOR WHICH THE DIS-
PUTED DEDUCTIONS WERE TAK-
EN TRUE PURCHASES OR DEPOS-
ITS?

The parties have stipulated that the purchases for which both the deductions at issue were taken, received and used in the following year were in both instances true purchases from third parties rather than a mere deposit with third parties or other conditional purchase (Stipulation of Fact No. 14 and 22). The feed and field ingredients purchased by Golden Rod Farms during the year ended June 29, 1974 *and not delivered by the third party sellers to Golden Rod Feed Mill, Inc. for processing and shipment to taxpayer until the next tax year* were purchased by the corporate taxpayer in seven separate purchases from Cargill, Inc., Pillsbury and Poultry By-Products between the dates of May 29, 1974 and June 28, 1974. None of the sellers is related to Golden Rod Farms (Clarifying Fact No. 4 from Second Affidavit of Forrest H. Ingram) (Stipulation of Fact No. 9). The feed or feed ingredients purchased by Golden Rod Farms during the year ended July 3, 1976 and *not delivered by the sellers to Golden Rod Feed Mill, Inc. until the next tax year* were purchased by the corporate taxpayer in eleven separate purchases from Poultry By-Products, Cargill, Inc., Continental Grain Company, Owensboro Grain Co., Gold Kist Oil Products, Pillsbury Company and Central States Grain between the dates of June 7, 1976 and June 30, 1976. None of these sellers is related to Golden Rod Farms (Clarifying Fact No. 5 from Second Affidavit of Forrest H. Ingram) (Stipulation of Fact No. 9).

Since Golden Rod Feed Mill, Inc. at all pertinent times had capacity to store feed ingredients only for approximately one day's production of feed and delivered the processed feed to Golden Rod Farms immediately after processing (Clarifying Facts No. 2 and 4 from Second Affidavit of Forrest H. Ingram), it is a reasonable inference to be drawn from this evidentiary record that the various shipments of the Golden Rod Farms' feed or feed ingredients from the third party sellers to Golden Rod Feed Mill, Inc. had to be and were finely tuned from a delivery standpoint. The Court considers significant the complete absence of evidence showing that Golden Rod Feed Mills had any control or right of control over such feed or feed ingredients until the feed or feed ingredients were actually delivered by the third party sellers to Golden Rod Feed Mill for immediate processing and immediate delivery to Golden Rod Farms.

All of the deliveries of the feed or feed ingredients by the third party sellers to Golden Rod Feed Mill, Inc. at the direction of the payer were admittedly made in the new tax period of Golden Rod Farms immediately following its year end purchases. Golden Rod Feed Mill under the undisputed facts of this case had nothing to refund to Golden Rod Farms at any time with respect to the transactions in question nor did it possess the right to substitute and ship other goods or products to Golden Rod. Farms for the feed or feed ingredients which it received from the third party sellers at the direction of the purchasing taxpayer. Moreover, the feed mill operator was under the clear duty to process such goods for Golden Rod Farms into processed chicken feed. Given these facts, it is difficult to understand the government's argument that the described year end payments by Golden Rod Farms to the third party sellers for feed or feed ingredients nevertheless constituted deposits made by Golden Rod Farms to Golden Rod Feed Mill in the year of purchases or thereafter. While the facts do show that Golden Rod Feed Mill, Inc. gave credit to Golden Rod Farms on the purchase price of processed feed sold by it to Golden Rod Farms for which Golden Rod Farms had furnished the unprocessed feed or field ingredients via third party sellers, it is without dispute that the credit so given by Golden Rod Mill, Inc. was to reduce the amount which Golden Rod Farms paid it for such processed feed by an amount equal to the then mar-

(Clarifying Facts No. 2 and No. 3 from Second     Affidavit of Forrest H. Ingram).

ket value of such unprocessed feed or field ingredients (Clarifying Fact No. 3 from First Affidavit of Forrest H. Ingram). This is a far cry from an adjustment made to the contract price to reflect market value at the date of delivery.

There is no evidence of refunds actually being made to the taxpayer. Nor is there evidence that Golden Rod Farms through Forrest H. Ingram acting by himself or acting in concert with his fellow officers and directors or otherwise could have refunded to itself such prepayments as it chose. There are no "baby trades" in the commodity markets.

The government argues in brief that while the funds paid over to the third party sellers were nonrefundable deposits, Golden Rod Farms could have gotten refunds on its *credit* with Golden Rod Feed Mill, Inc. since both corporations were owned by the same shareholders, had the same officers and directors, and thus were controlled by the same interests. In addition, the government argues, there was no written contract between Golden Rod Farms and Golden Rod Feed Mill, Inc. This argument continues with the assertion that Golden Rod Farms consequently could have substituted other feeds or supplies *for the credit it received from the feed mill.* Moreover, rising to the crescendo before the crash, the government proclaims that the taxpayer was not purchasing feed from the third party sellers which it could have used in the form in which it was purchased. It was assertedly purchasing feed ingredients which had to be milled into feed by the addition of vitamins and other supplements. Accordingly, so says the government, under the rule enunciated in *Stice v. United States,* 540 F.2d 1077 (5th Cir.1976), the *credits* which Golden Rod Farms had with Golden Rod Feed Mill, Inc. and which constitute the basis for the deductions which were disallowed were in the nature of deposits. Since the credits were in the nature of deposits, argues the government, the deduction for the feed ingredients must be disallowed.

The foregoing argument of the government deserves short shrift but requires analysis. It presupposes without any support from this evidentiary record that the shipment of the purchased feed or feed ingredients by the third party sellers to Golden Rod Feed Mill, Inc. at the direction of Golden Rod Farms established a *credit* or *credits* extended by the feed mill to the taxpayer with an undefined structure and to an unexplained extent which placed Golden Rod Farms in position to have received a refund from Golden Rod Feed Mill, Inc. of the purchase price of the feed or feed ingredients paid by the taxpayer to the third party sellers in its preceding tax year. Or does the government argue that the taxpayer's right to "refund" from the friendly feed mill was the then market value of the purchased feed or feed ingredients? The government's extension of its "refund" argument through its naked (very naked) assertion that since it was all in the family Golden Rod Farms could have substituted other feed or supplies for the *credit* it received from the feed mill conveniently ignores several rather elementary facts. Foremost, the taxpayer is in a grow out broiler operation and needs to feed its chickens to get them to grow and "grow out." It purchased chicken feed or chicken field ingredients from the third party sellers for the purpose of feeding its chickens. A chicken which does not grow out and grow out quickly and in good health is a liability in the grow out chicken business. The taxpayer directed the third party sellers to ship the purchased chicken feed or chicken feed ingredients to Golden Rod Feed Mill, Inc. at times certain for the purpose of the feed mill immediately processing such chicken feed or chicken feed ingredients with the infusion of vitamins and other supplements and promptly shipping such processed chicken feed to its broiler grow out operation or operations because it needed to feed its chickens nutritious chicken feed. Nutritious chicken feed is simply a must for a grow out chicken operation. There is no evidence that the taxpayer needed or wanted other feed or supplies or that the feed mill was in posi-

tion to furnish taxpayer other feeds or supplies had taxpayer wanted or desired such substitution *for the credit it received from the feed mill.* The fact that such purchases were made at the near end of its 1974 and 1976 taxable years with delivery and ultimate consumption geared for the next suceeding taxable year for tax advantage does not alone establish an improper purpose.

The Court has repeatedly underlined the word *"credit"* in writing to the government's argument in order to emphasize the government's erroneous assertion that the shipments by the third party sellers to Golden Rod Feed Mill, Inc. of the purchased feed or feed ingredients created a *credit* of some sort with the feed mill in favor of the taxpayer. Whatever name should be properly ascribed to the relationship created between the taxpayer and the feed mill by such shipments, it is far more likely that the law placed an *obligation* on the feed mill to process the feed or feed ingredients into processed chicken feed and thereupon to ship it to the taxpayer in accordance with the settled course of dealing between the parties rather than creating an unanticipated and unwanted *credit* in favor of the broiler grower with nebulous corresponding rights of refund and/or substitution of something which neither party ever contemplated.

This evidentiary record utterly fails to support the government's argument that Golden Rod Farms was not purchasing feed from the third party sellers which it could have used in the form in which it was purchased but was purchasing feed or feed ingredients which had to be milled into chicken feed by the addition of vitamins and other supplements. Assuming, arguendo, that a reasonable inference can be drawn from the facts shown by this record that the feed or feed ingredients purchased by the taxpayer from the third party sellers was rendered more palatable and more nutritious by the milling process (with attendant infusion of vitamins and other supplements), it does not follow that the unmilled feed or feed ingredients purchased by the taxpayer in connection with and for its broiler "grow out" operations could not have been feasibly used for its intended purpose. Moreover, the First Affidavit of Forrest H. Ingram, Clarifying Fact No. 5, establishes without contradiction that the feed ingredients purchased by Golden Rod Farms, Inc. in the amount of $1,449,525.00 during the year ended June 29, 1974 and $3,192,899.75 during the year ended July 3, 1976 could have been resold by Golden Rod Farms, Inc. on the open market or delivered to another mill for processing into processed feed. The possibility of the taxpayer reselling the feed for which prepayment is made exists, of course, in every legitimate "feeder tax shelter" whose objective is to defer taxation by way of immediate deduction for feed purchases in one year and disposed of in another. This possibility, however, does not alone render invalid this type of tax shelter for which the law provides.

The government makes much ado in this case over the admitted close affiliation between the corporate taxpayer, the corporate feed mill, and the fact that taxpayer and the feed mill are owned by the same shareholders and have the same officers and directors. It is quite correct that this fact situation warrants close scrutiny by the Court in a tax case of this nature but the Court has found no indicia of fraud surrounding or permeating these disallowed transactions from this evidentiary record and declines the government's invitation to indulge in speculation and conjecture as to what this fact pattern could have conceivably produced. As long as the law of the land allows parent and subsidiary corporations and/or brother and sister corporations with interlocking or closely related officers and directors and common shareholders and recognizes the legitimacy of such related/affiliated business operations in corporate form absent proof of improper business activity and/or fraudulent or illegal conduct, there is no valid reason known to the Court which flat out prohibits one such corporation from planning or implementing a legitimate feeder tax shelter with another affiliated corpora-

tion peripherally or even closely involved. It is equally or even more plausible to assume that the corporate officials here involved are honest and trustworthy than it is to assume their dishonesty or their improper or illegal purpose in consummating the transactions here under scrutiny. The Code does not bar this corporate taxpayer from availing itself of the Code provisions, regulations and revenue ruling here involved. Neither will this Court by judicial fiat without supporting evidences.

Finally, the government's reliance on *Stice v. United States, supra,* to support its argument that the taxpayer's year end prepayments to the third party sellers for chicken feed or feed ingredients for delivery and use in the tax year following constituted nondeductible deposits for purpose of federal income tax in the tax years in which such prepayments were made rather than ordinary and necessary business expenses is misplaced. In addition to the fact that the disputed deductions here were not taken for the credits given Golden Rod Farms by Golden Rod Feed Mill, Inc. against the price of the chicken feed delivered after processing in the tax years following the years of purchase from the third party sellers, the facts of the *Stice* case further distinguish it from the instant case and consequently that decision is not controlling in this situation. The Court now proceeds to show why this is so.

In the *Stice* case the taxpayer Stice was a farmer who, during the periods involved in his appeal, raised cotton, wheat and milo (a feed grain) on approximately 3,000 acres of land in Terry County, Texas. Prior to 1968 Stice bought most of his fertilizer for his farm from two suppliers, Goodpasture Grain & Milling Company (Goodpasture) and Pat-Sol Company and paid for the fertilizer when received.

In November of 1968 Stice's wholly-owned corporation, Johnson Gin, Inc., became a dealer for the sale of Goodpasture's agricultural fertilizer and chemicals.

In December of 1969 Stice wrote three checks to Johnson Gin in the amounts of $52,596, $8,400 and $8,625 for a total of $69,621.00. The check written for $52,596 bore a notation that $27,638 of that amount was for 300 tons of 11–37–0 fertilizer and the remaining $24,960 was for 400 tons of 16–20–2 fertilizer. The $8,400 check was for 70 five-gallon cans of Treflan and the $8,.625 check was for 25 thirty-gallon drums of Fumazone. From all of these orders, the only fertilizer actually delivered in 1969 was roughly 91 tons of 16–20–2 fertilizer at approximately $73 per ton, for a total of $6,661.62.

Johnson Gin's dealership agreement with Goodpasture did not require prepayments by Johnson Gin for any materials ordered from Goodpasture; nor did Johnson Gin require any of its customers to prepay for materials ordered from it. Stice testified that one customer may have possibly paid Johnson Gin in April 1970 for fertilizer delivered in May 1970.

In each of the years that Stice made prepayments for fertilizer and other chemicals to be delivered the following year, he deducted the prepayments on his income tax return. Stice filed his income tax returns and maintained his records on a cash receipts and disbursements basis. After auditing Stice's 1969 income tax return, the Commissioner of Internal Revenue disallowed the deduction Stice claimed for that portion of his December 1969 prepayments which remained as an outstanding credit at the end of the year. Stice paid the resulting deficiency in income taxes plus interest and late payment penalty and filed a claim for a refund by the amounts paid. After disallowance of the claim, Stice brought suit in the district court for a refund. After all the evidence was in, the Court submitted the case on three special interrogatories requesting the jury to determine: (1) whether the $63,000 (approximately) paid by the taxpayer and disallowed as a deduction constituted a deposit; (2) whether taxpayer's income tax return on which the $63,000 was claimed as a deduction clearly reflected his income for that year; and (3) whether taxpayer had a valid business purpose in paying the $63,000 in December 1969. The jury returned special verdicts in

favor of taxpayer in all three instances. The district court entered judgment for taxpayer after denying the government's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. From this judgment, the government appealed.

In reversing the district court judgment in favor of the taxpayer Stice the former Fifth Circuit held that substantial prepayments made by a taxpayer, a farmer, in December of 1969, to his wholly-owned subsidiary, for fertilizer and other chemicals to be delivered the following year, constituted nondeductible deposits for purposes of 1969 income tax, rather than ordinary and necessary business expenses, where, although there were specific quantities stated at the time prepayment was made, those quantities bore little relationship to items actually charged against taxpayer's credit, taxpayer could have refunded the prepayments to himself, taxpayer received no cost advantage and prepayment was not a condition imposed by the seller.

In *Stice* the former Fifth Circuit extensively quoted facts from the evidentiary record in the court below. The following quotes are pertinent:

As noted, the taxpayer in December of 1969 made a prepayment to his wholly owned supplier in the amount of $69,621. Below is a table showing alleged purchases made in 1969 constituting this credit:

Materials "purchased" in 1969

| Item | Unit Price | Total Price |
|---|---|---|
| 400 tons of: 16–20–2 fertilizer | $62.40/ton | $24,960 |
| 200 tons of: 11–37–0 fertilizer | $92.12/ton | $27,636 |
| 350 gallons of: Treflan | $24/gallon | $ 8,400 |
| 25 thirty-gallon drums of: Fumazone | $345/drum | $ 8,625 |
| Total "purchases" in 1969 | | $69,621 |

Of all of the goods claimed as purchased in 1969, only about 91 tons of 16–20–2 fertilizer, at a cost of approximately $73 per ton, or $6,662, were actually delivered in that year. In 1970, 111 gallons of Treflan, at $22.40 per gallon, and 9 thirty-gallon drums of Fumazone, at $345 per drum, were actually received, for a total of $5,591. The other purchases that were charged against the $69,621 credit to taxpayer's account in 1970 were as follows: chemicals other than Treflan and Fumazone, $6,975; gasoline and cotton burs, $2,756; cotton seeds and unidentified supplies, $31,313; rental for fertilizer applicator, $190; 114 tons of fertilizer other than 16–20–2 and 11–37–0, $7,437. Taxpayer does not in any way refute these figures, but argues that his receipt of such goods as seed, chemicals, and gasoline, all of which were used in the farming operation and the cost of which was credited against the 1969 prepayment was sufficient to allow a deduction for the year in question. The argument seems based principally on the fact that no refund of any prepayment was ever made. We do not find this persuasive.

540 F.2d at pp. 1079–80.

At page 1080 of 540 F.2d the *Stice* court quoted from a recently published revenue ruling:

In a recently published revenue ruling, Rev.Rul. 75–152, Int.Rev.Bul. No. 1975–17, the Commissioner stated:

"Whether a particular expenditure is a deposit or a payment depends on the facts and circumstances of each case. Where it can be shown that the expenditure is made pursuant to a binding commitment to accept delivery of a specific quantity of feed at a fixed price, and the buyer is not entitled, under contract provision or business custom, to a refund or repurchase, the expenditure will not be considered a deposit. The following factors, although not all inclusive, are indicative of a deposit, rather than a payment: the absence of specific quantity terms; the right to refund of any unapplied credit at the termination of the contract ...; the treatment of the expenditure as a deposit by the seller; and the right to substitute other goods or products for the feed ingredients specified in the contract."

This ruling indicates clearly that taxpayer's prepayment was a deposit. While there were specific quantities stated at the time the payment was made, those quantities, as noted, bore little relationship to the items actually charged against taxpayer's credit. The issue of specificity in determining the nature of a payment is supported by *Estate of Cohen v. C.I.R.*, ¶ 70,272 P–H Memo T.C., p. 1331 (1970). In *Cohen* the court held that a provision in one of the contracts which called for "the payment of '22 = ½ ¢ per pound weight gain during feeding' with $54 per head payable in advance (a total advance payment of $16,686) does not set forth with sufficient specificity that this is an actual purchase of feed.... [Taxpayer] did not purchase merchandise with the remittance of $16,-686 but instead merely created a debit balance in an account that was to be credited as his cattle were fed and gained weight. For this reason we conclude that this was a deposit and was not properly deductible in ... the ... taxable year before us." *Id.* at 1340.

540 F.2d at p. 1080.

Continuing with its factual development from the record below, the former Fifth Circuit wrote:

Also, while there was no evidence of refunds actually being made to taxpayer, it is apparent that taxpayer, as the sole owner of Johnson Gin, could have refunded to himself such prepayments as he chose. In allowing deductions of substantial end-of-year payments in *Ernst v. C.I.R.*, 32 T.C. 181 (1959), the tax court stated that such payments were clearly not deposits because they "were absolute and petitioner, who reported his income on a cash receipts and disbursement basis, was irretrievably out of pocket the amounts paid, which amounts were obviously expenses incident 'to carrying on a trade or business.' In return for these payments, the grain dealer was unconditionally obligated to deliver the quantity of feed which the amounts received would pay for at the prices in effect on the dates of delivery. There was no condition as to the obligation itself; the only condition was as to the *quantum* of the obligation." *Id.* at 285–186. The relationship that taxpayer had with Johnson Gin was much less restrictive. Any "obligations" that taxpayer may have had to Johnson Gin were flexibly interpreted by both parties, and were not of the binding nature of those in *Ernst*. More applicable to the facts in this case are *Shippy v. United States*, 8 Cir., 1962, 308 F.2d 743, where the court found that a substantial prepayment was merely an advance deposit because it would have been refunded upon request, and *Lillie v. C.I.R.*, 45 T.C. 54 (1965), aff'd per curiam, 9 Cir. 1966, 370 F.2d 562, where the court found too little correlation between what was paid for and what was delivered to allow the deduction.

540 F.2d at pp. 1080–81.

Returning to quotes from the evidentiary record Judge Simpson wrote for the former Fifth Circuit Court of Appeals:

Assuming *arguendo* that taxpayer could not have demanded a refund, he

was still not without recourse as in fact he applied the credit to a variety of goods other than those claimed to have been purchased with the prepayment. Additionally it appears that he sold some of the supplies purchased from Johnson Gin to his son and to neighbors. Appellant's Appendix, pp. 97–98, 100, 235. The record is clear that taxpayer not only had the right to substitute goods for the goods specified, but did in fact so substitute. All of these factors, in light of Rev.Rul. 75–152, supra, persuade us that the 1969 "purchase" must be treated as a deposit.

540 F.2d at p. 1081.

Noting that the taxpayer was entitled to deduct the ordinary and necessary business expenses of his farming operations pursuant to Title 26, U.S.C., Section 162(a), and Treasury Regulation, 26 C.F.R., Section 1162–12(a), the *Stice* court observed that those provisions provided no support for deductions of end-of-year payments, *where, as in the instant case, the prepayment bore only slight relationship to the goods actually received* (emphasis supplied).

Again quoting from Rev.Rul. 75–152 the former Fifth Circuit in *Stice* stated:

"The second test [for deductibility] is that the prepayment must be made for a valid business purpose and not merely for tax avoidance. Generally, the factor that distinguishes the court decisions allowing a deduction for prepaid feed costs from those disallowing the deduction is the acquisition of, or the reasonable expectation by the taxpayer of receiving, some business benefit as a result of the prepayment: *See John Ernst*, 32 T.C. 181 (1959), acq., 1959–2 C.B. 4; *Cravens v. Commissioner*, 272 F.2d 895 (10th Cir. 1959); *Shippy v. United States*, 308 F.2d 743 (8th Cir.1962), aff'g 199 F.Supp. 842 (W.D.S.Dak.1961), aff'd per curiam, 370 F.2d 562 (9th Cir.1966). Examples of business benefit include, but are not limited to: fixing maximum prices and securing an assured feed supply or securing preferential treatment in anticipation of a feed shortage. Whether the prepay-

ment was a condition imposed by the seller and whether such condition was meaningful should also be taken into consideration in determining whether there was a business purpose for the prepayment."

1975–1, C.B., p. 144, Rev.Rul. 75–152.

See also in this connection, *Mann v. C.I.R.*, 8 Cir.1973, 483 F.2d 673, where the court allowed the deduction because it found, *inter alia*, that the maximum price guarantee was a benefit to taxpayer because it protected him against a rising market price; *Gaddis v. United States*, 330 F.Supp. 741 (S.D.Miss.1971), where the district court entered judgment for taxpayer because the prepayment was made primarily in the light of forecasts of an increase in the price of feed and as a protection for future increase.

540 F.2d at p. 1081.

Finally, the *Stice* court observed in closing out its opinion reversing the judgment of the lower court in favor of the taxpayer:

This record contains no evidence that the taxpayer sought or secured the type of advantage under discussion. There was no indication of any shortage of the goods ordered, or that taxpayer would receive any business advantage not available without any prepayment. Taxpayer received no cost advantage as he paid more for the fertilizer received than the December 1969 agreement provided for. Lastly, such prepayment was not a condition imposed by the seller. Taxpayer was the only Johnson Gin's customer ever making a substantial prepayment.

For the enumerated reasons, the jury verdict for the taxpayer is not supported by the evidence. The only logical conclusion to be drawn from the record is that the dominant, if, indeed not the only purpose for taxpayer's substantial end-of-year prepayments was an attempt to provide a basis for a significant tax deduction for the taxable year 1969. The Commissioner's disallowance of such deduction was justified as a matter of law, and accordingly it was error for the district

court to deny the government's motion for judgment n.o.v.

540 F.2d at pp. 1081–82.

Unlike the taxpayer in *Stice,* the taxpayer here, Golden Rod Farms, Inc., could not have received a refund from Golden Rod Feed Mill, Inc. despite their interconnection because no payment was made by this taxpayer to Golden Rod Feed Mill. The prepayments for which the disputed deductions were made were paid by this farmer taxpayer to unrelated third party sellers of feed or feed ingredients. Moreover the deliveries by the third party sellers of the purchased feed or feed ingredients to Golden Rod Feed Mill, Inc. in the next tax year following the tax year of prepayment by Golden Rod Farms and the actual processing and actual shipment of such processed feed by the feed mill to the taxpayer, with consequent credit extended by the feed mill to the taxpayer based on the then market price of the prepaid ingredients used in the milling process, could have covered a span of three or four days at the most in each transaction before the processed feed was in the possession and under the control of the taxpayer for use in its grow out broiler operation, *the very purpose intended by the prepayment procedure followed by the taxpayer.* These are reasonable inferences drawn from this evidentiary record (First Affidavit of Forrest H. Ingram, Clarifying Facts No. 2, No. 3 and No. 4; Stipulation of Facts). Furthermore, the Stipulation of Facts include stipulation that the prepayments for which the disputed deductions were made were paid to unrelated third parties, were genuine purchases and were not refundable deposits with third parties. Thus, the government's refund-argument involving only the taxpayer and the feed mill operator and their relationship for three or four days at the most in connection with each disputed transaction is tenuous, to say the least, and illogical to characterize it charitably.

By letter brief of August 19, 1985 (received by the Court on August 20, 1985) the government sought to clarify certain points made by the United States in its brief supporting its motion for summary judgment which it states may have been misconstrued in the taxpayer's response brief (filed on August 1, 1985). The Court now quotes from the government's August 19, 1985 letter brief:

> Both arguments overlook the most significant factor to be considered in viewing the transactions in issue, that is, that Golden Rod purchased "feed ingredients"—not feed. The significance of this factor is that Golden Rod was not purchasing the actual supplies that it used in business; it was purchasing the ingredients for a supply since it was purchasing feed ingredients that could be used only after additives such as vitamins were included and the ingredients were milled into feed. Since Golden Rod purchased feed ingredients instead of the feed itself, it is clear that the payments made to third parties for the feed ingredients were not actual prepayments for feed but were in the nature of a deposit to be applied against the cost of feed to be delivered in the future by Golden Rod Feed Mill.
>
> Golden Rod argues that, since it received only a reduction in price from the feed mill, it could not possibly have made a deposit that could be refunded. Again, it glosses over the fact that it and the feed mill are owned by the same shareholders and have the same officers. Since there was no written agreement between it and the feed mill, any reduction in price it received could have easily been converted by the officers of the corporations into a refund check. Whether the plaintiff calls it a reduction in price, the fact remains that the plaintiff bought feed ingredients in the millions and had delivery made to the feed mill. Therefore the plaintiff had a legal right to be paid for these ingredients either in cash or goods in a barter exchange.

After again pressing its initial argument that the former Fifth Circuit Court decision in *Stice* controls the holding in the instant case (a position which this Court rejects because of the distinguishable facts), the

government presents the following argument in its August 19, 1985 brief:

> In its response brief, Golden Rod argues that the *Stice* decision is not applicable in the instant case since Golden Rod never received an actual refund as compared to the taxpayer in *Stice* who used the prepayment for supplies other than the fertilizer for which the prepayments were ostensibly made. That argument was laid to rest by the Fifth Circuit in *Schenk v. Commissioner*, 686 F.2d 315 (5th Cir.1982). In *Schenk*, the dispute concerned prepayments for fertilizer made in 1975, and the Fifth Circuit stated:
>
> > We recognize that Schenk did indeed take delivery of the fertilizer he had purportedly purchased during the final hours of 1975. Viewed with the benefit of hindsight, his 1975 expenditures might appear to have been prepayment for fertilizer and farm supplies actually delivered during the following year. However, we cannot have a rule of tax accounting in which the deductibility of important expense items turns upon events or contingencies occurring long after the close of the tax year. "[S]uch retrospective adjustments based on events transpiring in subsequent years ... [would] threaten the integrity of the annual accounting period." Ward, *Tax Postponement*, 53 Tex.L.Rev. 1119, 1143 (1975). In determining whether Mr. Schenk's year-end expenditures can be deducted from his 1975 income, we must look to the facts as they existed on December 31, 1975, the day the curtain closed on the Schenks' tax year. On that day it was by no means certain that Schenk would actually use his December 30 expenditure for the purchase of fertilizer in the following year. This fact leads us to conclude that under the rule set forth in *Stice*, Schenk's December 30 expenditure was a mere deposit and not a *bona fide* prepayment.

*id.* at 319.

Thus, the question to be answered is whether Golden Rod made an irrevocable commitment to use its prepayments to purchase feed, not whether in fact Golden Rod purchased the feed. Since Golden Rod and the feed mill are controlled by the same parties and since Golden Rod did not have a binding agreement, or any · written agreement at all, with the feed mill, and the payment made by Golden Rod must be viewed as a refundable deposit that is not deductible in the year of payment.

In *Schenk v. Commissioner of Internal Revenue*, 686 F.2d 315 (5th Cir.1982), an appeal from a decision of the United States Tax Court holding that the farmers' year-end expenditure in alleged prepayment for fertilizer to be delivered in the following year was not a deductible prepayment, the new Fifth Circuit Court held: (1) *Stice* controlled the result adverse to the appealing taxpayer; and (2) that where the taxpayer farmer retained power to substitute nonfertilizer, nondeductible items in years following the purported "prepayment," the expenditure could not be characterized as a bona fide fertilizer payment deductible from taxable income in the year of expenditure. While this reported decision by the present Fifth Circuit is not binding precedent in the Eleventh Circuit,[3] it is accepted by this Court as persuasive authority if the relevant facts of that case are not distinguishable from the relevant facts in this action. Moreover, the fact that the *Schenk* court found that the *Stice* case controlled in Schenk's appeal lends even more respectibility to *Stice* which is, of course, a former Fifth Circuit Court case which is binding precedent in the Eleventh Circuit, sitting in banc.

The facts and procedural history of *Schenk* appear on pages 316–17 of 686 F.2d and are quoted verbatim because of the earnest insistence of the government that

---

3. The Eleventh Circuit, in the en banc decision *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11 Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

*Schenk* is "icing on the cake" with respect to its position that Golden Rod Farms' prepayments for chicken feed or feed ingredients were properly disallowed as mere deposits:

Taxpayer-appellant LaVerne Schenk (footnote omitted) is a Texas farmer who raises wheat and milo and "runs a few cattle." For several years, Mr. Schenk has been an officer (footnote omitted) and member of the Dawn Agricultural Cooperative, an organization which sells farm supplies (footnote omitted) and personal consumption items (footnote omitted) to its members.

Each year Mr. Schenk buys substantial amounts of fertilizer, farm supplies, and groceries from the Cooperative Throughout the early 1970's, it was his practice to "prepay" for many of these purchases. Each December, Mr. Schenk would deliver a check to the Cooperative to cover the cost of fertilizer and supplies delivered and consumed during the following year.

In accord with his standard practice, Mr. Schenk delivered a $25,000 check to the Cooperative on December 30, 1975. This check bore a notation indicating that $20,000 was to be used for the purchase of approximately 100 tons of fertilizer and $5,000 would be for "general supplies." Upon receipt of Schenk's check, the Cooperative credited these "payments" to separate "fertilizer" and "general supply" accounts that it maintained for each of its members.

During the following year, Schenk actually took delivery of $20,000 worth of fertilizer which was charged against his "fertilizer" account. He also purchased farm supplies and personal consumption items which were charged against his "general supply" account.

Once Schenk had made the $25,000 expenditure, he could not receive a cash refund. However, in making his "prepayment" Schenk was not irrevocably committing himself to the purchase of specific goods within a limited span of time. If a Cooperative member ordered supplies or grocieries and his general supply account balance could not cover the cost of the purchase, funds would be transferred from the member's fertilizer account into his general supply account. (footnote omitted) Similarly, if a member ordered fertilizer and his fertilizer account balance would not cover the purchase, the fertilizer shipment would be charged against his general supply account. (footnote omitted) Moreover, if annual purchases of fertilizer, supplies, or groceries did not exhaust the amounts prepaid, any outstanding balances could be carried forward to cover the cost of purchases made in future years. Thus, while Schenk characterized his December 1975 expenditure as a "fertilizer prepayment," he had not irrevocably committed himself to the purchase of fertilizer in the following calendar year. If he chose not to take delivery of fertilizer during 1976, he could have purchased other farm supplies or personal consumption items and charged the cost of these goods against his "fertilizer account" balance. If he chose not to make any purchases in the following year, his outstanding balances could have been carried forward and used to fund purchases of goods delivered far in the future.

Although the Schenks chose to pay for their annual purchases in advance, their decision to prepay did not secure any special business advantage. The Cooperative did not require prepayment as a condition of membership and prepayment did not provide the Schenks with a guaranteed price. (footnote omitted) While Schenk claims to have believed that prepayment might guarantee a supply of fertilizer in the event of a shortage, the Tax Court found that prepayment afforded no such benefit. (footnote omitted)

II. PROCEDURAL HISTORY

In preparing his 1975 federal income tax return, Mr. Schenk claimed the entire December 30, 1975 expenditure as a deduction from his 1975 taxable income. Although very little of that $25,000 expenditure had actually been used to pay for fertilizer or supplies delivered in

1975, (footnote omitted) Schenk maintained that he could take the deduction in 1975 because he was a cash basis taxpayer and payment had been made in 1975.

As luck would have it, the Schenks' 1975 federal income tax return was selected for examination. The Internal Revenue Service took the position that the $25,000 year-end expenditure could not be deducted from the Schenks' 1975 income because the outlay was a mere "deposit" and not a *bona fide* "prepayment." Accordingly, the Service issued a Notice of Deficiency. In response, the Schenks elected to institute proceedings in the U.S. Tax Court.

Following a brief trial, the Tax Court made factual findings which the parties concede to be fair and accurate. (footnote omitted) The Tax Court found, *inter alia,* that Mr. Schenk's 1975 year-end expenditures were nonrefundable and that during the following year he did in fact take delivery of the fertilizer and supplies he had purportedly paid for. Nevertheless, the Tax Court held that Schenk's year-end expenditure was not a deductible prepayment because at the time he made the outlay, he was not irrevocably bound to the purchase of fertilizer in the following year. Relying upon this Court's decision in *Stice v. United States,* 540 F.2d 1077 (5th Cir. 1976), the Tax Court held that because the taxpayers retained the right to purchase a wide variety of goods with the funds ostensibly earmarked for the purchase of fertilizer, the expenditure could not be characterized as a *bona fide* fertilizer prepayment. (footnote omitted) Accordingly, the Tax Court upheld the Commissioner's determination of a deficiency. (footnote omitted) The Schenks then brought this appeal. (footnote omitted) 686 F.2d at pp. 316–317.

There are several material footnotes in the above quoted portion of *Schenk* which have been omitted from such quotation for technical reasons only. The Court now sets out such footnotes below because they are helpful to an understanding of the *Schenk* decision.

*Schenk Footnotes from p. 316 of 686 F.2d:*

3. During the tax year here in question, 1975, Mr. Schenk served as President of the Dawn Cooperative.

4. The taxpayers purchased fertilizer, seed, feed, fuel, tools, parts, and chemicals from the Cooperative.

5. The taxpayers annually purchased several hundred dollars worth of soft drinks, pet food, and groceries from the Cooperative.

6. For example, in December of 1973, Schenk paid $23,000 to the Cooperative, all of which was credited to his "fertilizer" account. However, during the following year, about $3400 was transferred from his fertilizer account to his "general supply" account in order to cover the cost of supplies and goods other than fertilizer. Similarly, in December of 1974, Schenk paid $20,000 to the Cooperative, all of which was credited to his fertilizer account. However, during the following year, over $10,000 was transferred from his fertilizer account to his general supply account.

7. In 1975, several thousand dollars worth of Schenk's fertilizer purchases were charged against his general supply account.

*Schenk Footnotes from p. 317 of 686 F.2d:*

8. Accounts were charged on the basis of the price prevailing at the time of delivery, not the date of payment.

10. The Tax Court determined the only $218 of the $25,000 expenditure represented payment for farm supplies actually delivered in 1975.

11. The Tax Court's decision is set forth in *Schenk v. Commissioner,* T.C. Memo 1980–531.

13. The Schenks had claimed the entire $25,000 expenditure as a deduction from their 1975 income. The Tax Court found that only $218 represented payment for farm supplies delivered in 1975 and that the ¶ 4,782 balance

was a mere deposit for future purchases. Accordingly, the Tax Court upheld the Commissioner in disallowing $24,-782 of the claimed deduction.

After determining and holding that *Stice* governed Schenk's appeal and dictated an affirmance of the Tax Court's opinion which also held that the former Fifth Circuit's opinion in *Stice* controlled its decision, the *Schenk* court wrote:

> In the case now before us, the Tax Court held that our opinion in *Stice* controlled its decision. We agree. Taxpayer-farmer Schenk, like taxpayer-farmer Stice, made large lump-sum prepayments nominally earmarked for fertilizer to be delivered in the year following payment. However, Schenk, like Stice, was never obligated to take delivery of fertilizer. Schenk, like Stice, retained the option to have his fertilizer prepayment applied to the purchase of entirely different products, even groceries or pet food. See *supra* note 6. Moreover, if his annual purchases of fertilizer, supplies, or groceries failed to exhaust the amounts prepaid, any outstanding balances could be carried forward to cover the cost of purchases made in future years. Thus, although Schenk's December 30, 1975 payment was ostensibly for the purchase of fertilizer to be delivered in 1976, he actually retained the right to use these funds for the purchase of many other products far into the future. Conceivably, Schenk could even have used the December 30, 1975 expenditure to cover the cost of soft drinks delivered in 2001. (footnote omitted)
>
> We recognize that Schenk did indeed take delivery of the fertilizer he had purportedly purchased during the final hours of 1975. Viewed with the benefit of hindsight, his 1975 expenditures might appear to have been prepayment for fertilizer and farm supplies actually delivered during the following year. However, we cannot have a rule of tax accounting in which the deductibility of important expense items turns upon events or contingencies occurring long after the close of the tax year. (footnote omitted)

> "[S]uch retrospective adjustments based on events transpiring in subsequent years ... [would] threaten the integrity of the annual accounting period." Ward, *Tax Postponement*, 53 Tex.L.Rev. 1119, 1143 (1975). In determining whether Mr. Schenk's year-end expenditures can be deducted from his 1975 income, we must look to the facts as they existed on December 31, 1975, the day the curtain closed on the Schenks' tax year. On that day it was by no means certain that Schenk would actually use his December 30 expenditure for the purchase of fertilizer in the following year. (footnote omitted) This fact leads us to conclude that under the rule set forth in *Stice*. Schenk's December 30 expenditure was a mere deposit and not a *bona fide* prepayment. (footnote omitted)

> \* \* \* \* \* \*

> A payment cannot be characterized as a deductible fertilizer expense until it is clear that the expenditure will actually be used for the purchase of fertilizer. Because the taxpayers in this case retained the power to substitute nonfertilizer, nondeductible items in the years following their purported "prepayment," we conclude that their expenditure cannot be characterized as a *bona fide* fertilizer prepayment. For this reason, the decision of the Tax Court must be and is hereby

> AFFIRMED.

*Id.*, 686 F.2d 319–320.

*Schenk Footnotes, p. 319 of 686 F.2d:*

19. Thus, an expenditure to cover the cost of fertilizer to be purchased "some day" will not constitute a *bona fide* prepayment. There must be some chronological fixation. In this case, the Schenks' "commitment" to purchase fertilizer was so open-ended, it might even have violated the Rule Against Perpetuities if that ancient doctrine were to be applied to fertilizer conveyancing.

20. "All the revenue acts which have been enacted since the adoption of the

Sixteenth Amendment have uniformly assessed the tax on the basis of annual returns showing the net result of all the taxpayer's transactions during a fixed accounting period." *Burnett v. Sanford & Brooks Co.*, 282 U.S. 359, 363, 51 S.Ct. 150, 151, 75 L.Ed. 383 quoted in *Security Flour Mills Co, v. C.I.R.*, 321 U.S. 281, 286, 64 S.Ct. 596, 598, 88 L.Ed. 725 (1944).

21. In previous years, funds nominally earmarked for "fertilizer" purchases had been intermingled with funds used to purchase a wide variety of farm supplies and personal consumption items. See *supra* note 6.

22. Mr. Schenk has attempted to distinguish the facts of the *Stice* case from his own situation, pointing out that the taxpayer in *Stice* used a prepayment to buy farm supplies other than the fertilizer he had ostensibly purchased, while he (Schenk) actually took delivery of the fertilizer he had paid for. Schenk now suggests that a taxpayer should be able to deduct prepaid farm expenses to the extent that the items paid for are actually delivered in the following year. However, this Court has already rejected this argument. In *Stice*, the taxpayer did take delivery of $13,000 worth of chemicals and fertilizer purportedly purchased in the preceding year. Nevertheless, we refused to allow Stice to deduct the $13,000 paid in 1969 for farm supplies actually delivered in 1970. Instead, we disallowed the entire prepayment.

In *Stice*, as in this case, the crucial issue was not whether the taxpayer ultimately chose to take delivery of supplies purportedly purchased in a prior year. The question was whether the taxpayer had, at the time of payment, irrevocably committed himself to the purchase of specific items within a specific year.

This Court concludes and holds that the facts of *Schenk* are clearly distinguishable from the Golden Rod Farm facts shown by this evidentiary record and that *Schenk* will not be accepted by the Court as per-

suasive or controlling authority against the taxpayer in this case. Schenk, like Stice, was never obligated to take delivery of the fertilizer. Golden Rod Farms was unquestionably obligated to take delivery of the chicken feed or chicken feed ingredients which it purchased at year end from the third party sellers for delivery in the tax year immediately following. Moreover, this evidentiary record shows a legal obligation on the part of Golden Rod Farms to take delivery of such chicken feed or chicken feed ingredients, as processed by Golden Rod Feed Mill, Inc., after the feed mill accepted delivery of such prepaid chicken feed or chicken feed ingredients from the third party sellers. Such delivery was made at the instance and direction of the taxpayer. While perhaps desirable, no written contract was necessary to establish such obligation. It is significant to note that the feed mill's acceptance of delivery of such feed or feed ingredients was for one purpose and one purpose only, namely, to process that feed or feed ingredients and to immediately ship it to Golden Rod Farms for use in its broiler grow out operation.

Schenk, like Stice, retained the option to have his fertilizer prepayment applied to the purchase of entirely different products, even groceries or pet food. Moreover, if his annual purchases of fertilizer, supplies or groceries failed to exhaust the amounts prepaid, any outstanding balance could be carried forward to cover the cost of purchases made in future years. Unlike Schenk and Stice, the taxpayer here retained no option to have its prepayments for chicken feed or chicken feed ingredients made by it to unrelated third parties applied to the purchase of entirely different products. While the government urges that once such prepaid chicken feed or chicken feed ingredients (corn, soy meal, poultry meal and poultry fat—Second Affidavit of Forrest H. ingram, Clarifying Facts No. 2 and No. 3) came into the possession of Golden Rod Feed Mill, Inc. at the instance and direction of the taxpayer for processing into processed feed the taxpayer ipso facto became possessed of an option

not to accept delivery of the processed feed but to have its prepayments for chicken feed or chicken feed ingredients (with which the feed mill had no connection) applied to the purchase of entirely different products from the feed mill. Who granted this option? Does not an option require a grantor? What other entirely different products did the feed mill sell? If the feed mill did sell entirely different products, did taxpayer have a business reason to need them? Obviously these questions, while pertinent, cannot be answered because this record is barren of facts which would justify the government's argument. The government's attempt to gloss over this void by emphasizing and re-emphasizing the relationship of the taxpayer familial corporation and Golden Rod Feed Mill, Inc. and their interlocking directorates simply misses the mark. In addition to these mentioned facts dissimilarities between *Schenk-Stice* and this case, there is no "carry-over" evidence in this record. For the reasons above stated, the Court declines to accord *Schenk* controlling or even persuasive status in this litigation as supportive of the government's position.[4]

The government's argument in its August 19, 1985 letter brief to the effect that since there was no written agreement between the corporate taxpayer and the feed mill corporation any reduction in price the taxpayer was due to receive on the processed feed equal to the then market value of the prepaid feed or feed ingredients furnished by the taxpayer to the feed mill operator for its use in processing such feed easily have been converted into a refund check from the feed mill corporation to the taxpayer overlooks or ignores the quite elementary fact that the word "refund" by widely accepted definition means *"to give or put back"*; *"to return money in restitution"*; *"repayment"*. *Webster's Ninth New Collegiate Dictionary, 1983.* Example of pertinent definition: "The govern-

ment refunded the overpayment I made on my taxes."

The undisputed facts of this case do not show expenditures of this taxpayer to cover the cost of feed or feed ingredients to be purchased "some day."[5] These facts establish firm year-end commitments to purchase the feed or feed ingredients from unrelated third parties, firm year-end purchases of such feed or feed ingredients, and unequivocal year-end payments of the purchase price of such feed or feed ingredients. "Looking to the facts as they existed" as of the respective dates of these year-end feed or feed ingredient purchases by taxpayer it is by all means reasonably certain that taxpayer had committed itself to actually use its *purchased feed or feed ingredients* in the following year. Moreover, looking to the facts as they existed on the last day of the 1974 and 1976 tax year (fiscal), the day the curtain closed on Golden Rod Farms' fiscal years here in question, as the *Schenk* court said "is" obligatory, the Court's quest for the proper rationale in determining whether the taxpayer's year-end expenditures can be deducted from its income for its tax years ended June 29, 1974 and July 3, 1976 has been substantially benefited.[6] Finally, if in spite of the directive of *Schenk* (which the government cites in brief as authoritative and highly persuasive in this case) this Court or any other is permitted to look at the facts coming into existence from and following the last day of each tax year in question, the conclusion reached by the Court is strengthened by the stipulated facts that the taxpayer used such feed in its broiler grow out operation in the following tax year in each instance a tax deficiency was assessed. The feed ingredients for which a deduction was taken in the taxable year ending on June 29, 1974 were received and used by Golden Rod Farms during the period from June 30, 1974 through November, 1974, a period of approximately four months. (Stipulation of Fact No. 9.) The

---

**4.** Ironically, the law enunciated by the *Schenk* court is strongly supportive of this taxpayer under the stipulated and clarified facts.

**5.** See *Schenk,* at p. 319 n. 19 of 686 F.2d.

**6.** See *Schenk,* at p. 319 of 686 F.2d.

996

feed ingredients for which a deduction was taken in the taxable year ending on July 3, 1976 were received and used by Golden Rod Farms during the period beginning July 4, 1976 and ending December 1, 1976, a period of approximately five months. (Stipulation of Fact No. 16.)

■ The prepayments disallowed by the Internal Revenue Service in the instant case were clearly not deposits under the facts shown by this evidentiary record. *Revenue Ruling 79–229. First of tripartite standard.*

## WERE THE PREPAYMENTS MADE FOR A BUSINESS PURPOSE AND NOT FOR TAX AVOIDANCE?

The parties have stipulated that the purchases in question were made by the taxpayer in order to assure an adequate supply of feed and in order to fix the price of feed ingredients at the price in effect at the time of the purchases (Stipulation of Facts No. 15 and No. 23).

The government by stipulation of fact and nonargument of this issue in brief concedes that the disallowed prepayments were made for a valid business purpose and not for tax avoidance.

The existence of a business purpose for the prepayment of feed is considered by many courts to determine the deductibility of the expense. Illustrative is the Tax Court case of *Heinold v. Commissioner,*. 39 T.C.M. (CCH) 685 (1979):

> The factor that generally distinguishes the court decisions allowing a deduction for prepaid feed costs from those disallowing the deduction is the reasonable expectation by the taxpayer of receiving some business benefit as a result of the prepayment. (Citations omitted). If an expenditure is appropriate and helpful to the taxpayer's business, the courts are reluctant to override a taxpayer's judgment.

*Id.,* at p. 689.

■ Several factors are considered to determine the presence or absence of a business purpose. For example, taxpayers who

have paid for feed in advance in order to assure a supply of feed by gaining preferential treatment in case there was a feed shortage have been held to have acted with a business purpose. *Commissioner v. Van Raden,* 650 F.2d 1046 (9th Cir.1981), *Mann v. Commissioner,* 483 F.2d 673 (8th Cir.1973), *Cravens v. Commissioner,* 272 F.2d 895 (10th Cir.1959), and *Clement v. United States,* 217 Ct.Cl. 495, 580 F.2d 422 (1978). Also, purchases of feed in the taxable year prior to the year of consumption, made in order to fix the price to be paid for the feed for fear of a price increase due to market conditions or historical seasonal swings in price, have been held to be made pursuant to a valid business purpose. *Commissioner v. Van Raden, supra; Mann v. Commission, supra; Haynes v. Commissioner,* 38 T.C.M. (CCH) 950 (1979); *Heinold v. Commissioner, supra; De La Cruz v. Commissioner,* 37 T.C.M. (CCH) 24 (1978); and *Clement v. United States, supra.* Where the purchaser has consistently followed the practice of prepaying for feed, or the practice in the business community is to prepay for feed, the courts have also found this evidence of a valid business purpose for the purchase. *Frysinger v. Commissioner,* 645 F.2d 523 (5th Cir.1981); *Commissioner v. Van Raden, supra;* and *Haynes v. Commissioner, supra.*

■ For the reasons above set out, the Court holds that the purchase by Golden Rod Farms of the feed or feed ingredients in the amount of $1,449,525.00 during its tax year ended June 29, 1974, received and used in the following tax year, and in the amount of $3,192,899.75 during its tax year ended July 3, 1976, received and used in the following tax year, were each made for a business purpose other than tax avoidance for the timing of such payment. *Revenue Ruling 79–229. Second of tripartite standard.*

## DID THE DISALLOWED DEDUCTIONS IN THE YEAR OF PREPAYMENT RESULT IN A MATERIAL DISTORTION OF TAXPAYER'S INCOME?

Before proceeding to a discussion of this third requirement of Rev.Rul. 79–229,

1979–2 Cum.Bull. 210 (cited as applicable by both the taxpayer and the government in brief), the Court observes that this referenced ruling superseded Rev.Rul. 75–152, 1975–1 Cum.Bull. 144 but did not change its substantive provisions. *Frysinger v. C.I.R.*, 645 F.2d 523, 525 n. 2 (former Fifth Cir.1981).

By way of preface it is noted that despite that portion of Rev.Rul. 79–229 which reads:

> The business practice of prepayment does not necessarily refute the existence of a primary tax avoidance purpose or material distortion.
> In addition, the fact that the first two tests are satisfied does not automatically mean that the expenditure will be deductible in the year paid. A deferral of the deduction may be necessary to clearly reflect the taxpayer's income.

the proper determination of the *material distortion of income issue* in the instant case is necessarily influenced by the fact that: (1) taxpayer is a farmer within the meaning of the applicable regulations and for that reason is entitled to the special protections granted farmers under the tax laws; (2) the applicable regulations give farmers the option of using either the cash method or the inventory method of tax accounting;[7] (3) in conjunction with I.R.C. § 162, which allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, the applicable regulations permit farmers to deduct as necessary expenses all amounts actually expended in carrying on the business of farming;[8] (4) the applicable regulations clearly permit the deduction of feed expenses when paid rather than when the feed is actually consumed;[9] and (5) taxpayer had a legitimate purpose for the disallowed payments other than tax avoidance (Stipulation of Fact No. 15 and 23). Finally, the Court notes that its rejection of the government's argument that the year end purchases of the feed or feed ingredients in question by the taxpayer constituted refundable deposits is to be properly considered in the resolution of the remaining issue now addressed. *Frysinger*, 645 F.2d at 526–27.

■ This Court is firmly persuaded and holds that the year end deductions in this case fall squarely within the provisions allowing farmers to currently deduct feed expenses. As stated by the former Fifth Circuit Court of Appeals in *Frysinger v. C.I.R.. supra*, at p. 527:

> The distortion created by the deduction is inherent in the cash method, which for sake of accounting convenience does not attempt to accurately match expenses with income. The Commissioner by his own regulations has allowed farmers to use the cash method rather than the inventory system and to take current deductions for feed expenses despite the obvious possibility for substantial distortion of income in any one taxable year. See *United States v. Catto*, 384 U.S. at 111 n. 15, 86 S.Ct. at 1316 n. 5. We therefore agree with the Tax Court in *Van Raden* that although the cash method will usually result in some distortion

---

**7.** Treas.Reg. § 1.471–6(a) provides in part:

A farmer may make his return upon an inventory method instead of the cash receipts method. It is optional with the taxpayer which of these methods of accounting is used . . .

**8.** Treas.Reg. 1.162–12(a) provides in part:

A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming. . . . The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay, but not including the value of farm produce grown upon the farm or the labor of the taxpayer.

**9.** These special provisions have been recognized as an historical concession for farmers. In *United States v. Catto*, 384 U.S. 102, 116, 86 S.Ct. 1311, 1319, 16 L.Ed.2d 398 (1966), the Supreme Court noted:

> The sacrifice in accounting accuracy under the cash method represents an historical concession by the Secretary and the Commissioner to provide a unitary and expedient bookkeeping system for farmers and ranchers in need of a simplified accounting procedure.

of income, "[i]f the cash method is consistently utilized and no attempt is made to unreasonably prepay expenses or purchase supplies in advance, the distortion is not material." 71 T.C. at 1104.

In this case the taxpayer and the government have stipulated that the purchase by Golden Rod Farms of feed ingredients in the amount of $1,449,525.00 during its tax year ended June 29, 1974, received and used in the following tax year, was made in order to assure an adequate supply of feed and in order to fix the price of feed ingredients at the price in effect at the end of the fiscal year ending June 29, 1974 (Stipulation of Fact No. 15). The parties have further stipulated that the purchase by Golden Rod Farms of feed ingredients in the amount of $3,192,899.75 during its tax year ended July 3, 1976, received and used in the following tax year, was made by Golden Rod Farms in order to assure an adequate supply of feed and in order to fix the price for the feed ingredients at the price in effect at the end of the fiscal year ending July 3, 1976. (Stipulation of Fact No. 23)

Stipulations of Fact No. 10 and 17 show that these [disallowed] purchases were consistent with normal and good business practices. Taxpayer realized a savings of $177,005.00 in connection with its purchases of feed or feed ingredients from third party sellers made near the close of its tax year ending June 29, 1974 which were milled into chicken feed by Golden Rod Feed Mill, Inc. and immediately delivered to and fully used by taxpayer in the next succeeding four month period in its broiler grow out operation. A savings of $29,-697.10 was effected by taxpayer in connection with its year-end purchases of feed or feed ingredients from third party sellers during its tax year ending July 3, 1976. These purchases were milled into chicken feed by Golden Rod Feed Mill, Inc. and immediately delivered to and fully used by

taxpayer in the next succeeding five-month period.[10] This Court's conclusion and holding that these disallowed prepayments were reasonable in every respect is fully supported by the evidentiary record. As stated by the former Fifth Circuit in *Frysinger*, 645 F.2d at 527:

> The distortion created by the deduction, in light of the special treatment accorded farmers by the regulations, cannot be considered controlling.

The government relies on *Clement v. United States*, 217 Ct.Cl. 495, 580 F.2d 422 (1978), to support its position that the deductions taken by this taxpayer distorted its income for its tax years ended June 29, 1974 and July 3, 1976 but makes no mention in brief of the former Fifth Circuit's rejection of *Clement* in *Frysinger* (645 F.2d at p. 527). Moreover, as previously noted, Treas.Reg. § 1,461–1(a)(1), on which the *Clement* court relied, obviously has no application here.

Finally, a factor of some significance in the Court's conclusion that the disallowed deductions in the year of prepayment did not result in a material distortion of taxpayer's income is that if feed is consistently purchased in the tax year prior to the tax year it is used the tax liability over a period of years will be the same regardless of the method of tax accounting used by the taxpayer, i.e., regardless of whether the taxpayer is on a cash basis and deducts the purchase at the time it is made or on an accrual basis under which the taxpayer would allocate the expense over the period in which the feed is used. As stated by the Tax Court in *Heinold v. Commissioner*, 39 T.C.M. (CCH) 691:

> Over a period of time, consistent utilization of the cash method will produce a fair result. A 'distortion' in one year will be offset by a 'distortion' in another year so that over a period of time the taxpayer's income will be clearly reflected.

---

**10.** This evidentiary record clearly shows that Treas.Reg. 1.471–1(a)1 is not applicable in this case. That regulation provides:

> [i]f an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible, or may be deductible only in part, for the taxable year when made.

Golden Rod Farms has purchased feed or feed ingredients for use during the following year in its taxable years June 29, 1974, June 28, 1975, July 3, 1976, July 2, 1977, July 1, 1978, June 30, 1979, June 28, 1980, June 27, 1981 and July 3, 1982 (Stipulation of Fact No. 24). Because the tax rates for this taxpayer have been substantially the same during the tax years in which taxpayer has purchased feed or feed ingredients for use in the following tax year, it appears that the amount of Federal income tax which would have been payable by the taxpayer if the feed or feed ingredients had not been purchased until the tax year that the chicken feed was actually used in its broiler grow out operation would be substantially the same as the amount of Federal income tax paid by taxpayer by reason of its purchase of and prepayment for feed or feed ingredients which were not used until the tax year following the year of purchase and payment. These facts clearly indicate that taxpayer's taxable income was not materially distorted by its deduction for prepaid feed or feed ingredients in the taxable years ending in 1974 and 1976.

In a 60–page nutshell, the distortion here is not material and the deductions in question fall squarely within the provisions allowing farmers to currently deduct feed expenses. *United States v. Cato, supra; Frysinger v. C.I.R., supra; C.I.R. v. Van Raden,* 650 F.2d 1046 (9th Cir.1981) (holding that deduction of prepaid cattle feed expenses did not result in distortions of income). *Revenue Ruling 79–229, Third of tripartite standard.*

## CONCLUSION

For the reasons set out above, the Court finds and holds that the disallowance of the deductions for prepaid feed ingredients and the assessment of additional Federal income taxes by the government for the taxable years ending in 1974 and 1976 was illegal and erroneous. Golden Rod Farms, Inc. is entitled to recover from the government the sum of $89,364.68 for the amount of interest paid by Golden Rod Farms as a result of the tax deficiency assessed

against Golden Rod Farms for the tax year ending June 29, 1974, plus interest on such amount from October 8, 1976 to the date of payment to Golden Rod Farms; the sum of $32,546.15 in interest calculated at 7% per annum from October 8, 1976 until July 2, 1977 on the amount of the tax deficiency of $635,599.22 assessed against Golden Rod Farms for the tax year ending June 29, 1974, plus interest on such amounts as provided by law; and the sum of $130,-086.78 for the amount of interest paid by Golden Rod Farms as a result of the tax deficiency assessed against Golden Rod Farms for the tax year ending July 3, 1976, plus interest on such amount as provided by law. In event the government challenges the accuracy of these figures and sustains such challenge by proper proof, a corrective order will be entered.

An appropriate order granting taxpayer's motion for summary judgment and denying the government's motion for summary judgment will be entered in conformity with the findings and holdings herein made.

## ORDER

In conformity with the Memorandum of Decision this day entered herein, it is

ORDERED, ADJUDGED and DE-CREED that the Motion For Summary Judgment by the Defendant United States of America be and the same hereby is DENIED, that the Motion for Summary Judgment of Plaintiff Golden Rod Farms, Inc. be and the same hereby is GRANTED, and that Plaintiff Golden Rod Farms, Inc. have and recover of Defendant United States of America the sum of $89,364.68 for the amount of interest paid by plaintiff to defendant as a result of the tax deficiency assessed against plaintiff for the tax year ending June 29, 1974, plus interest on such amount as prescribed by law from October 8, 1976 to the date of payment to plaintiff; the sum of $32,546.15 in interest calculated at 7% per annum from October 8, 1976 until July 2, 1977 on the amount of the tax deficiency of $635,599.22 assessed against plaintiff for the tax year ending

June 29, 1974, plus interest on such amounts as provided by law; and the sum of $130,086.78 for the amount of interest paid by plaintiff to defendant as a result of the tax deficiency assessed against plaintiff for the tax year ending July 3, 1976, plus interest on such amount as provided by law.

Costs of this cause are taxed against defendant.

The Court expressly finds and determines there is no genuine issue of material fact with respect to the claims for relief herein asserted by plaintiff against defendant, that plaintiff is entitled to judgment in its favor against defendant as a matter of law with respect to such claims, and that there is no just cause or reason for delay in entry of this final judgment herein in favor of plaintiff and against defendant.